HARKEN SOUTHWEST
CORPORATION,
Petitioner,

v.

BOARD OF OIL, GAS AND MINING and Division of Oil, Gas and Mining, Department of Natural Resources, State of Utah, Respondents.

No. 950121.

Supreme Court of Utah.

July 16, 1996.

Alan L. Sullivan, Thomas W. Clawson, Salt Lake City, for petitioner.

Jan Graham, Att'y Gen., Thomas A. Mitchell, Asst. Att'y Gen., Salt Lake City, for respondents.

ZIMMERMAN, Chief Justice:

Harken Southwest Corporation ("Harken") operates several oil and gas wells in San Juan County. In March of 1994, Harken applied to the Utah Division of Oil, Gas and Mining ("Division") for designation of thirteen wells drilled between 1990 and 1992 as "wildcat" wells. Wildcat wells drilled after January 1, 1990, are exempt from severance taxes during the first twelve months of production. Utah Code Ann. § 59–5–102(2)(d). The Division refused to confer wildcat status on six of the wells, and Harken appealed to the Utah Board of Oil, Gas and Mining ("Board"). The Board affirmed the Division's decision, and Harken seeks review by this court. We affirm as to two of the wells, reverse as to one of the wells, and vacate and remand as to the other three wells.

A wildcat well is "an oil and gas producing well which is drilled and completed in a pool, as defined under Section 40–6–2, in which a well has not been previously completed as a well capable of producing in commercial quantities." *Id.* § 59–5–101(21). Section 40–6–2(18) of the Utah Code defines a pool as "an underground reservoir containing a common accumulation of oil or gas or both." That section also provides: "Each zone of a general structure that is completely separated from any other zone in the structure is a separate pool. 'Common source of supply' and 'reservoir' are synonymous with 'pool.'" *Id.* § 40–6–2(18). In other words, to qualify a well for wildcat status, the well operator must establish that the well was the first well capable of commercial production drilled into a pool, reservoir, or common source of supply.

All of the wells which are the subject of this appeal ("subject wells") penetrate similar subsurface structures known as algal mounds. Algal mounds are sponge-like piles of carbonate debris which were formed about 275 million years ago from the remains of algae that had settled to the sea floor. As these mounds of algal material stacked up, shale barriers formed around the mounds,

effectively sealing many of them and preventing hydrocarbons which had accumulated in the mounds from escaping or migrating to other mounds. Algal mounds are typically between one-quarter mile and one mile in diameter.

In determining that none of the subject wells qualified for wildcat status, the Board heard testimony from two main witnesses, both of whom interpreted the same data. Harken's witness, Dr. Mark W. Longman, is a consulting geologist recognized as an expert on algal mound formations in southeastern Utah. The Division's witness, Bradley G. Hill, also has experience in petroleum geology. The data they interpreted consisted of rock data, seismic data, and pressure and production data. Rock data, obtained by drilling wells, measure the density of the rocks into which a well is drilled. Rock data are used to identify algal mounds, which are highly porous and can therefore be drilled relatively quickly. Seismic data measure the thickness of layers of rocks such as the shale barriers surrounding algal mounds and allow geologists to map the features and geometry of algal mounds. Finally, pressure and production data are used to determine whether an algal mound from which a well is producing is continuous with any other algal mounds.

The Board also relied on an order of the Oil and Gas Conservation Commission ("Commission") issued in 1960 which established 80-acre drilling and spacing units for the Greater Aneth Area of San Juan County ("1960 spacing order"). Three of the subject wells are located within the Greater Aneth Area: the Blue Hogan 1–J–1 well ("Blue Hogan"), the Mule 31–M well ("Mule"), and the Brown Hogan 1–A–2 well ("Brown Hogan"). In the 1960 spacing order, the Commission found that the Greater Aneth pool, which underlies the Greater Aneth Area, "is continuous . . . and constitutes a common source of supply." The Commission then concluded, "One well [drilled on] each 80 acres will efficiently and economically drain the said pool or common source of supply as found in and underlying the Greater Aneth Area." On the basis of these findings, the Board employed a presumption that Blue

Hogan, Mule, and Brown Hogan were drilled into an extension of the Greater Aneth pool in which a well capable of commercial production had previously been drilled and, therefore, concluded that the three wells were not wildcat wells.

In refusing to confer wildcat status on the subject wells, the Board concluded that Harken failed to satisfy its burden of establishing that the wells were wildcat wells. On review, Harken asserts that (i) the Board erred in employing a presumption that Blue Hogan, Mule, and Brown Hogan were not wildcat wells; (ii) the Board's conclusion that none of the subject wells qualified for wildcat status is not supported by substantial evidence; and (iii) the Board incorrectly required Harken to prove "beyond a reasonable doubt" that the subject wells were wildcat wells. We consider Harken's arguments in order.

■ Harken first contends that the Board erred in presuming from the 1960 spacing order that Blue Hogan, Mule, and Brown Hogan were not wildcat wells. We agree with Harken. The presumption applied in this case was not legislatively or judicially created but was apparently adopted by the Board itself. As an administrative presumption, it must satisfy a test of logical probability. *See* Utah Code Ann. § 63–46b–16(4)(h)(iv) (requiring appellate court to grant relief from arbitrary or capricious agency action). In other words, "a presumption adopted and applied by the Board must rest on a sound factual connection between the proved and inferred facts." *NLRB v. Baptist Hosp., Inc.*, 442 U.S. 773, 787, 99 S.Ct. 2598, 2606, 61 L.Ed.2d 251 (1979). *See generally* 1 Clifford S. Fishman, *Jones on Evidence* § 4:56, at 391 (7th ed. 1992) (discussing validity of administrative presumptions). We conclude that no such logical connection supports the presumption adopted in this case.

In evaluating the relevance of the 1960 spacing order to the inference that Blue Hogan, Mule, and Brown Hogan were not wildcat wells, we must consider the spacing order in light of its function and the policies it was intended to serve. Spacing orders specify the density and location of wells in an area

which overlies an underground oil or gas reservoir. Utah Code Ann. § 40–6–6. To facilitate the efficient and economical drainage of the underlying pool, spacing orders establish drilling units on which only one well may be drilled. *Id.* § 40–6–6(2). Spacing orders must (i) include all lands determined to overlay the pool, (ii) define the size and shape of each drilling unit, and (iii) fix the location of the well within each drilling unit. *Id.* § 40–6–6(5)(b), (c), (d). In addition, spacing orders must "be made upon terms and conditions that are just and reasonable." *Id.* § 40–6–6(5)(a). Thus, spacing orders are dependent not only on a variety of factual determinations, but also on the need to balance the competing interests of affected parties and on the general requirement that they be reasonable.

In establishing 80–acre drilling units for the Greater Aneth Area, the Commission was concerned with both the specific goal of draining the Greater Aneth pool and the more general policies of "prevent[ing] waste, ... avoid[ing] the drilling of unnecessary wells[,] and ... protect[ing] the correlative rights of interested parties." Because the Commission was guided to a large degree by these general policies, it was not necessarily concerned with small-scale interruptions in the continuity of the Greater Aneth pool. In fact, the Commission recognized that such interruptions might exist when it found that "wells drilled with a density of one well to each 80 acres will, *with insignificant exceptions,* ... provide efficient and adequate intercommunication for all parts of the reservoir." (Emphasis added.)

■ In contrast to the 1960 spacing order, the determination of whether the subject wells qualify as wildcat wells is a purely factual determination that does not depend at all upon any underlying policies. *See* Utah Code Ann. § 59–5–101(21) (defining wildcat well). Because the Commission's finding that the Greater Aneth pool was continuous was influenced by the general policies it was attempting to serve and because these policies are irrelevant in determining whether a well qualifies for wildcat status, we conclude that the Board acted arbitrarily and capriciously in presuming from this finding that

Blue Hogan, Mule, and Brown Hogan were not wildcat wells. *See id.* § 63–46b–16(4)(h)(iv). Therefore, we vacate the Board's decision as to these three wells. Because of the highly technical nature of the evidence presented, we remand for the Board to reconsider that evidence and to decide, without relying on the 1960 spacing order, whether Harken has met its burden of establishing that the three wells are wildcat wells.

Harken next contends that the Board's conclusion that none of the subject wells qualified for wildcat status is not supported by substantial evidence. We will reverse the Board's decision only if we determine that it was "based upon a determination of fact, made or implied by the agency, that is not supported by substantial evidence when viewed in light of the whole record before the court." Utah Code Ann. § 63–46b–16(4)(g). Substantial evidence is " 'that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion.' " *U.S. West Communications, Inc. v. Public Serv. Comm'n,* 882 P.2d 141, 146 (Utah 1994) (quoting *Boston First Nat'l Bank v. Salt Lake County Bd. of Equalization,* 799 P.2d 1163, 1165 (Utah 1990)). This standard "does not require or specify a quantity of evidence but requires only ' "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ' " *Id.* (quoting *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938))). Nonetheless, in evaluating the sufficiency of the evidence, we will not sustain a decision which ignores uncontradicted, competent, credible evidence to the contrary. *US West Communications, Inc. v. Public Serv. Comm'n,* 901 P.2d 270, 275 (Utah 1995) (citing *Jones v. California Packing Corp.,* 121 Utah 612, 244 P.2d 640, 644 (1952)).

Because we are remanding as to Blue Hogan, Mule, and Brown Hogan, we consider the evidence only to the extent that it relates to the remaining three wells for which Harken seeks wildcat well designation: the North Heron 35–C well ("North Heron"), the Monument 8–N–2 well ("Monument"), and the Lone Mountain Creek 12–F–1 well ("Lone Mountain"). We address each of these wells individually, affirm as to North Heron and Monument and reverse as to Lone Mountain.

We first consider North Heron. In denying Harken's request for wildcat designation, the Board concluded that Harken failed to establish that North Heron was not in communication with a nearby well previously drilled by Harken called the Heron 35–H well ("Heron"). Although Dr. Longman testified that the two wells were not in communication, the Board was persuaded by Mr. Hill's testimony to the contrary. Dr. Longman interpreted seismic data as demonstrating that North Heron is isolated from Heron by an impermeable barrier of dense, tight rocks. In addition, Dr. Longman testified that production data from the two wells were inconsistent with a finding that the wells were connected. Specifically, Dr. Longman testified that Heron produced at a very high rate initially but rapidly declined to two barrels a day in late 1993. In contrast, North Heron continued to produce approximately 3,000 barrels a day during the same period. If the two wells were in communication, Dr. Longman opined, their production data would have been much more closely aligned. Finally, Dr. Longman testified that the presence of a dry hole between North Heron and Heron demonstrates a lack of communication between the two wells.

Mr. Hill disagreed, testifying that the data on which Dr. Longman relied were inconclusive as to whether North Heron and Heron were continuous. Mr. Hill explained that pressure data provided by Harken were nearly identical for the two wells, undermining Dr. Longman's conclusion that the wells were not connected. Mr. Hill also discounted Dr. Longman's testimony regarding the presence of a dry hole between North Heron and Heron, indicating that oil and gas had been recovered from the purported dry hole. Although Mr. Hill recognized that North Heron and Heron probably penetrate different algal mounds, he theorized that the edges of the two mounds may overlap, resulting in some communication between the wells. In

that event, Mr. Hill explained, Harken's seismic data would not be an accurate indicator of continuity.

In light of Mr. Hill's testimony, we cannot conclude that the Board erred in denying Harken's request to designate North Heron a wildcat well. Relying on Mr. Hill's testimony, the Board concluded that Harken failed to establish that North Heron and Heron penetrated separate pools. Because Heron was the first well capable of commercial production drilled into the pool, the Board found that North Heron was not a wildcat well. Although Harken presented significant evidence to the contrary, we find that the Board's conclusion is supported by substantial evidence, and we therefore affirm the Board's decision as to North Heron.

We next consider the Monument well. Monument lies in close proximity to a previously drilled, commercially producing well called the Cajon Mesa 8–D–1 well ("Cajon Mesa"), which was designated a wildcat well on May 27, 1994. In refusing to confer wildcat status on Monument, the Board rejected Dr. Longman's testimony that Monument was not in communication with Cajon Mesa. Dr. Longman's testimony regarding Monument was similar to that regarding North Heron. He identified a dry hole between Monument and Cajon Mesa, indicating that the two wells were not in communication. He interpreted seismic data as establishing that the two wells penetrated different algal mounds isolated from one another by a barrier of tight rocks preventing communication between them. And he explained that from the time they began producing, Cajon Mesa declined in pressure more quickly than Monument, "presumably indicating they are producing from separate reservoirs."

In opposition to Dr. Longman's conclusions, Mr. Hill testified that the similarity in the initial pressures of the two wells— Monument was 2095 pounds per square inch when it was drilled on April 30, 1990, and Cajon Mesa was 2152 pounds per square inch when it was drilled on May 7, 1990—suggests that there might be communication between the two wells around the dry well located between them. Again, Mr. Hill discounted the reliability of seismic data because of the

close proximity of Monument to Cajon Mesa. In light of this testimony, we think that the Board's conclusion that Harken failed to meet its burden of proving that Monument was not in communication with Cajon Mesa is supported by substantial evidence. Therefore, we affirm the Board's refusal to confer wildcat status on Monument.

Finally, we consider Lone Mountain. The Board concluded that Harken failed to establish that Lone Mountain was not in communication with the nearby Lone Mountain Canyon 1–44 well ("Lone Mountain Canyon"). In reaching this conclusion, the Board again discounted the testimony of Dr. Longman. Dr. Longman relied on pressure data, seismic data, and the presence of a dry well between Lone Mountain and Lone Mountain Canyon to conclude that the two wells were not connected. He testified that the initial pressure of Lone Mountain was sufficiently high to indicate that the pool into which the well was drilled had not previously been tapped by another well. He explained that initial well pressures are typically between 1700 and 2100 pounds per square inch, depending largely on the size of the reservoir, and that well pressure is expected to decline rapidly as oil is extracted from a well. For example, the initial pressure of Lone Mountain Canyon at the time it was drilled in 1983 was 1930 pounds, and while current pressure data for that well were unavailable, its pressure after producing approximately 350,000 barrels of oil and 600 million cubic feet of gas was predicted to be around 200 pounds. In comparison, the initial pressure of Lone Mountain when it was drilled in early 1991 was approximately 1800 pounds, dropping to about 900 pounds by early 1992. Dr. Longman testified that if Lone Mountain was in communication with Lone Mountain Canyon, the initial pressure of Lone Mountain would have been much lower, reflecting the decline in pressure of Lone Mountain Canyon. He also stated that the significant decline in the pressure of Lone Mountain after it had produced less than 25,000 barrels of oil suggests that the pool into which it is drilled is relatively small and is therefore not in communication with any other well. In addition, Dr. Longman relied on seismic data which he

interpreted as establishing that Lone Mountain and Lone Mountain Canyon penetrated distinct algal mounds that were separated by a barrier of tight rocks. Finally, Dr. Longman testified that the existence of a dry hole between Lone Mountain and Lone Mountain Canyon demonstrated that the two wells were not connected.

The only evidence presented in opposition to Dr. Longman's testimony was the testimony of Mr. Hill. Significantly, Mr. Hill did not affirmatively conclude that Lone Mountain was in communication with Lone Mountain Canyon, but merely attempted to raise a question as to whether the two wells were in communication by attacking Dr. Longman's conclusions. We do not think that Mr. Hill adequately rebutted Dr. Longman's testimony. As he had done with regard to North Heron and Monument, Mr. Hill questioned the reliability of seismic data because of the close proximity of Lone Mountain and Lone Mountain Canyon. Mr. Hill also testified that Dr. Longman's reliance on pressure data was flawed because Dr. Longman lacked empirical evidence of Lone Mountain Canyon's current pressure and instead assumed that because the well had been producing for some time, its pressure would have dropped significantly. However, Mr. Hill ignored the logical basis for Dr. Longman's assumption and offered no explanation as to why the assumption might not be true in this case. Moreover, Mr. Hill made no attempt to contradict Dr. Longman's critical testimony that the initial pressure of Lone Mountain was in the range of what would be expected in a previously untapped pool, indicating that Lone Mountain was not in communication with Lone Mountain Canyon. Finally, Mr. Hill failed to rebut Dr. Longman's conclusion that the presence of a dry hole between Lone Mountain and Lone Mountain Canyon demonstrated a lack of continuity in the two wells. In fact, Mr. Hill admitted that unlike the dry hole between North Heron and Heron, the dry hole between Lone Mountain and Lone Mountain Canyon had never produced oil or gas.

■ The Board's findings regarding Lone Mountain essentially parallel the testimony of Mr. Hill, including his failure to respond to all of Dr. Longman's testimony. Considering the whole record before the court, we conclude that the Board's finding that Lone Mountain was not a wildcat well was not supported by "that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *U.S. West,* 882 P.2d at 146. Mr. Hill did not offer an affirmative opinion as to whether Lone Mountain was a wildcat well, did not question Dr. Longman's competency or credibility, and did not contradict critical portions of Dr. Longman's testimony which supported his opinion that Lone Mountain was a wildcat well. On this record, we cannot determine how the Board could have reached its conclusion without ignoring this competent, credible, and uncontradicted testimony. Therefore, we conclude that the evidence before the Board was insufficient to support its finding that Lone Mountain was not a wildcat well, and we reverse the Board's decision as to that well. *See* Utah Code Ann. § 63–46b–16(4)(g).

Finally, Harken contends that the Board erroneously required Harken to prove "beyond a reasonable doubt" that the subject wells were wildcat wells. Because we vacate the Board's decision as to Blue Hogan, Brown Hogan, and Mule and because we reverse the Board's decision as to Lone Mountain, we consider Harken's claim that the Board applied an improper standard of proof only as to North Heron and Monument.

■ Both parties recognize that the proper standard of proof in the administrative context is generally the "preponderance of the evidence" standard. *See In re D'Angelo,* 105 N.M. 391, 393, 733 P.2d 360, 362 (1986) (per curiam) ("Absent an allegation of fraud or a statute or a court rule requiring the higher standard, the standard of proof in administrative hearings is a preponderance of the evidence."), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). This standard requires the proponent of a contested fact to demonstrate that its existence is more likely than not. *Koesling v. Basamakis,* 539 P.2d 1043, 1046 (Utah 1975). However, Harken asserts that the Board imposed a higher standard of proof, citing certain lan-

guage in the Board's order suggesting that Harken could not have prevailed unless every possibility of communication between the subject wells and previously drilled wells had been conclusively eliminated.

We disagree with Harken's characterization of the Board's order; statements in the Board's order indicate that the Board applied the correct standard of proof. For example, before considering the subject wells individually, the Board stated, "Based on the testimony and evidence presented by Harken and the Division, the differing conclusions of the two witnesses, and the Board's experience with the Greater Aneth Area, *the Board finds the testimony of Mr. Hill to be more persuasive.*" (Emphasis added.) Then, in evaluating the specific evidence relevant to North Heron and Monument, the Board repeated that it found the evidence of communication between the subject wells and previously drilled wells more persuasive than Dr. Longman's testimony to the contrary. In light of these statements, we conclude that the Board applied the correct standard of proof.[1]

In conclusion, we hold that the Board acted arbitrarily and capriciously in relying on the 1960 spacing order to presume that Blue Hogan, Mule, and Brown Hogan were not wildcat wells. Accordingly, we vacate the Board's decision as to those three wells and remand to the Board to reconsider the evidence without relying on the 1960 spacing order. We also hold that the Board's conclusion that Lone Mountain was not a wildcat well was not supported by substantial evidence, and we therefore reverse the Board's refusal to confer wildcat status on that well. Finally, we hold that the Board's conclusion that North Heron and Monument were not wildcat wells was supported by substantial evidence and that the Board properly applied the "preponderance of the evidence" standard of proof in determining whether those wells qualified as wildcat wells. Therefore, we affirm the Board's decision not to confer

wildcat status on North Heron and Monument.

STEWART, Associate Chief Justice, and HOWE, DURHAM and RUSSON, JJ., concur in Chief Justice ZIMMERMAN's opinion.

---

1. We note that we are reversing the Board's decision regarding Lone Mountain due to a *lack* of supporting evidence. This deficiency is analytically distinct from the burden of proof the

Board imposed on Harken. Under a "preponderance of the evidence" standard, the Board is free to weigh the credibility of witnesses so long as their testimony has an evidentiary foundation.