2001 UT 23

**WWC HOLDING CO., INC., Petitioner,**

v.

**PUBLIC SERVICE COMMISSION OF UTAH, Stephen F. Mecham, Clark D. Jones and Constance B. White, Commissioners of the Public Service Commission of Utah, Respondents.**

No. 20000835.

Supreme Court of Utah.

March 5, 2002.

Matthew F. McNulty, III, Salt Lake City, and Mark J. Ayotte, Philip R. Schenkenberg, Saint Paul, MN, for petitioner.

Sander J. Mooy, Gregory B. Monson, Joni Dickson Seko, Jerry D. Fenn, Salt Lake City, for respondents.

WILKINS, Justice.

¶ 1 WWC Holding Co., Inc. ("WWC") petitions us to review the Public Service Commission's order denying it rural Eligible Telecommunications Carrier status and requiring it to price its universal service offerings at or below the Affordable Base Rates. We affirm.

## BACKGROUND

¶ 2 Because the party seeking review of an agency's order following a formal administrative proceeding has the burden to prove that the agency's factual findings are not supported by substantial evidence, we state the facts and all legitimate inferences to be drawn from them in the light most favorable to the agency's findings. Utah Code Ann. § 63–46b–16(4)(g)(1997); *Hales Sand & Gravel v. Audit Div.*, 842 P.2d 887, 888 (Utah 1992).

¶ 3 Promoting universal service—that is, ensuring that all Americans have access to affordable phone service—has long been a fundamental goal of telecommunications regulation. *See, e.g.,* 47 U.S.C. § 151 (2001)(creating the Federal Communications Commission and stating that its purpose is to make available affordable communications services to all citizens). In furtherance of this goal, federal and state subsidies ("universal service support") are available to encourage providers of telecommunications services ("common carriers") to provide service to rural areas and low-income consumers. *See* 47 U.S.C. § 214(e)(2001); Utah Code Ann. § 54–8b–15 (2000). These subsidized telecommunications services are known as universal service offerings. Only Eligible Telecommunications Carriers ("ETCs") are eligible to receive universal service support, 47 U.S.C. § 214(e)(1), Utah Admin. Code R746–360–6(A), and state commissions have been given the authority to designate common carriers as ETCs. 47 U.S.C. § 214(e)(2). Although there are multiple requirements for ETC designation and receipt of universal service support funds, only two are at issue in this case: (1) the federal requirement that a state commission must find that designating an additional ETC in a rural area is in the public interest, 47 U.S.C. § 214(e)(2), and (2) the state requirement that to be eligible for state universal service support, a telecommunications corporation may not charge retail rates in excess of the Affordable Base Rates for basic telecommunications service as determined by the Utah Public Service Commission ("PSC"). Utah R746–360–6(B).

¶ 4 WWC is a common carrier that provides telecommunications services using commercial mobile radio, or wireless, technology. WWC filed a petition with the PSC seeking designation as an ETC in Utah and eligibility to receive state and federal universal service support. In its petition WWC represented that it met the requirements for becoming an ETC and advocated that designation of it as an ETC in rural areas would serve the public interest. The PSC held a hearing on WWC's petition at which WWC presented one witness in favor of its petition. Six witnesses, testifying on behalf of two state organizations, the Division of Public Utilities and the Committee of Consumer Services, and two private organizations, the Utah Rural Telecom Association and U.S. West, testified against the petition.

¶ 5 After these formal proceedings, the PSC issued an order ("Order") designating WWC as an ETC in *non-rural* areas served by U.S. West. WWC's eligibility to receive state universal service support for service in these areas was contingent, among other things, on WWC charging no more than the Affordable Base Rates, defined by the Order as the rates previously set by the PSC for U.S. West for the areas at issue, for its universal service offerings. The PSC found that it would not be in the public interest to designate WWC as an additional ETC in *rural* areas served by incumbent carriers. It found that designation of WWC as an ETC in these areas would increase demands on the state universal service fund without any offsetting benefits and consequently declined to designate WWC as an ETC in these areas. We have jurisdiction to review the PSC's final order pursuant to section 78–2–2(3)(e)(i) of the Utah Code. This review followed.

## ISSUES PRESENTED AND STANDARDS OF REVIEW

¶ 6 WWC disputes the PSC's finding that granting it ETC status in the applied-for

rural areas would not be in the public interest. WWC also disputes the PSC's requirement that in order to receive state universal service support for the areas in which it was designated an ETC, it must price its universal service offering at or below the Affordable Base Rates.

¶ 7 Review of administrative decisions is governed by the Utah Administrative Procedures Act ("UAPA"), Utah Code Ann. §§ 63–46b–0.5 to –23 (1997 & Supp.2001). Administrative decisions based on formal administrative proceedings are reviewed under section 63–46b–16. For a reviewing court to grant relief under UAPA, it must determine, on the basis of the agency's record, that the party has been "substantially prejudiced" by the agency action. Utah Code Ann. § 63–46b–16(4)(1997). A party has been substantially prejudiced if "the alleged error was not harmless." *Mountain Fuel Supply Co. v. Pub. Serv. Comm'n*, 861 P.2d 414, 423 (Utah 1993). In making this determination, the court will apply different standards of review depending on whether the issue is one of fact, law, or legal discretion. *See* § 63–46b–16(4).

¶ 8 We uphold an agency's factual findings if supported by substantial evidence. § 63–46b–16(4)(g). As we explained in *Harken Southwest Corp. v. Bd. of Oil, Gas and Mining:*

> Substantial evidence is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion. This standard does not require or specify a quantity of evidence but requires only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Nonetheless, in evaluating the sufficiency of the evidence, we will not sustain a decision which ignores uncontradicted, competent, credible evidence to the contrary.

920 P.2d 1176, 1180 (Utah 1996) (citations and internal quotation marks omitted). When challenging factual findings, the appellant has the burden of "marshaling all of the evidence supporting the findings and then, despite the supporting facts, showing that the findings are not supported by substantial evidence." *Kennecott Corp. v. Utah State*

*Tax Comm'n*, 858 P.2d 1381, 1385 (Utah 1993). Issues of legal discretion may be challenged only by showing that "the agency action is … an abuse of the discretion delegated to the agency by statute." § 63–46b–16(h)(i); *see also Morton Int'l, Inc. v. Auditing Div.*, 814 P.2d 581, 587–89 (Utah 1991)(construing § 63–46b–16(h)(i)). "[A]n agency has abused its discretion when the agency's action, viewed in the context of the language and purpose of the governing statute, is unreasonable." *Morton Int'l*, 814 P.2d at 587. Finally, absent a grant of discretion, legal issues are reviewed under a correction-of-error standard. § 63–46b–16(4)(d); *see also Morton Int'l*, 814 P.2d at 588–89. This standard is especially appropriate where the agency possesses no special expertise which would place it in a better position than the court to decide the issue. *See Morton Int'l*, 814 P.2d at 586–87.

## ANALYSIS

### I. PUBLIC INTEREST ANALYSIS

¶ 9 We first address WWC's public interest arguments. As discussed above, the PSC is required by 47 U.S.C. § 214(e)(2) to make a public interest finding prior to designating an additional ETC in a rural area. After a formal administrative proceeding, the PSC found that designation of WWC as an ETC in rural areas already served would not be in the public interest. As explained in the Order, this finding appears to be based on two sub-findings: (1) that designation of an additional ETC in rural areas already served would increase burdens on the state universal service fund ("State Fund"), and (2) that this increased burden would not be offset by the corresponding public benefits of lower cost service or service in areas which are currently unserved.

¶ 10 WWC argues that the PSC should not have considered the effect of ETC designation on the State Fund as a matter of law. WWC also argues that it presented evidence to the PSC showing that designating it as an ETC would result in the public interest benefits of increased competition, choice, mobility, and a larger local calling area, that the PSC erred by "ignoring" these benefits, and that,

had these benefits been considered, the public interest test would have been tipped in WWC's favor.

¶ 11 Because the challenge to the Order's public interest findings deals with several different issues, we apply two different standards of review. What, exactly, constitutes "public interest" for purposes of ETC designation is a question, the resolution of which has been granted to the discretion of the PSC. 47 U.S.C. § 214(e)(2). Because the PSC is granted authority and discretion by statute to determine what constitutes public interest, we review the question of whether or not the PSC could legally consider particular factors in determining public interest under the abuse of discretion standard. *See id.;* Utah Code Ann. § 63–46b–16(h)(i)(1997). How the PSC weighs these factors to arrive at its ultimate conclusion is an issue we also review for abuse of discretion. *Id.* The question of whether public interest factors are met is a question of fact, limiting our review to determining whether or not there is substantial evidence in the record to support the PSC's findings. § 63–46b–16(4)(g).

*A. Consideration of Impact on State Fund*

¶ 12 WWC argues that the PSC should not have considered impact on the State Fund in making the public interest determination. It contends that by considering impact on the State Fund, the PSC's Order holds that the State Fund is per se incompatible with competition and that the Order, therefore, violates federal and state law.

¶ 13 WWC's argument mischaracterizes the PSC's findings. The Order does find that designating an additional ETC in rural areas—or, as WWC expresses it, allowing competition in rural areas—may increase burdens on the State Fund. The Order does not, however, say that because of this the PSC will never allow competition in rural areas by refusing to designate additional rural ETCs. Rather, the Order says that in the *absence* of corresponding public benefits, increasing the burdens on the State Fund is not in the public interest. Moreover, the Order leaves open the possibility that if incumbent ETCs can reduce costs sufficiently

such that even with additional common carriers receiving rural ETC designation, no additional burdens are placed on the State Fund, additional ETC designations could be in the public interest, regardless of whether corresponding public benefits accompanied the ETC designation. Thus, the PSC's Order is not against competition per se, but, rather, merely recognizes that in *some instances* competition in *rural areas* by multiple ETCs receiving state universal service support may not be in the public interest. This, in the opinion of the PSC, is one such instance.

¶ 14 The statutory language that "the State commission shall find that the designation is in the public interest," 47 U.S.C. § 214(e)(2), gives the PSC authority and thereby discretion to determine what is in the public interest. Aside from alleging a congressional preference for promoting competition, an issue which we need not address today, WWC has not cited any authority which explicitly limits the factors the PSC can consider in determining what is, or is not, in the public interest. Having been given the discretion to determine what is, or is not, in the public interest for ETC designation purposes, we see no indication that the PSC has abused its discretion in relying on impact on the State Fund as a public interest factor. We can find an abuse of discretion only if "the [PSC's] action, viewed in the context of the language and purpose of the governing statute, [47 U.S.C. § 214(e)(2),] is unreasonable." *Morton Int'l, Inc. v. Auditing Div.,* 814 P.2d 581, 587 (Utah 1991). As discussed above, WWC's sole argument is that the context and purpose of 47 U.S.C. § 214(e)(2) mandates competition. However, as the Order is not against competition per se, WWC's argument fails. WWC has not presented any other grounds to justify a finding that consideration of the impact on the State Fund is unreasonable given the context and purpose of 47 U.S.C. § 214(e)(2). We therefore hold that the PSC did not abuse its discretion in determining that impact on the State Fund was a proper public interest factor.

¶ 15 Having concluded that the PSC could legitimately consider impact on the

State Fund in determining public interest, the question then becomes whether the PSC's factual determination that the State Fund would be negatively impacted is supported by substantial evidence in the record. Utah Code Ann. § 63–46b–16(4)(g) (1997). WWC has not met its burden of "marshaling all of the evidence supporting the findings" of the PSC and "showing that the findings are not supported by substantial evidence." *Kennecott Corp. v. Utah State Tax Comm'n,* 858 P.2d 1381, 1385 (Utah 1993). Instead, WWC has simply pointed to testimony in the record favorable to its position without dealing with the testimony unfavorable to its position upon which the PSC based its findings.

¶ 16 The record contains expert testimony stating that there was a strong probability that designating a second ETC in many areas would reduce revenues to all ETCs. This, in turn, could result in either (1) an increase in the total costs of providing universal service support, or (2) a reduction in funding to ETCs, resulting in rate increases, decreases in infrastructure investment and/or service. The likely effect of either scenario would be to increase financial demands on the State Fund. This testimony in the record is sufficiently substantial to support the PSC's finding on this issue. *See Harken Southwest Corp. v. Bd. of Oil, Gas and Mining,* 920 P.2d 1176, 1180 (Utah 1996).

### B.  Absence of Public Benefits

¶ 17 As discussed above, the fact that the State Fund could be negatively impacted by designation of WWC as an additional ETC was not fatal to WWC's application. The PSC declined to grant WWC rural ETC status based on the combination of the possibility that the State Fund might be negatively impacted along with its finding that this likely detriment would not be offset by public benefits. The PSC's Order specifically identified two public benefits—lower cost service and new service to currently unserved areas—which, had they been present, presumably would have been enough to overcome the State Fund detriment. Because WWC does not contest the consideration of these public interest factors, we need

not address whether the PSC abused its discretion in considering these factors. We therefore focus solely on whether the PSC's factual findings that designation would not provide these benefits are supported by substantial evidence in the record. *See* Utah Code Ann. § 63–46b–16(4)(g)(1997); *Harken,* 920 P.2d at 1180.

¶ 18 The record contains testimony supporting the conclusion that designation would not provide public benefits, specifically, that it would not result in lower prices or service to currently unserved areas. In regard to lower prices, the record contains testimony that competition in rural areas with little customer growth could result in higher average costs for rural telephone companies. These higher costs could result in higher prices for consumers. Additionally, WWC did not provide the PSC with information on the specific rates it intended to charge customers for its services. Although WWC said rates would be comparable to competitors', it did not know what rural telephone companies presently charge and admitted it had not determined what its rates would be. Ultimately, based on this testimony, the PSC found that WWC's prices "may well be higher than the incumbent prices." This testimony is sufficiently substantial to support the PSC's finding, *see Harken,* 920 P.2d at 1180, and we defer to the PSC's expertise in this area in reaching this conclusion.

¶ 19 With regard to serving currently unserved areas, it appears that there was significant ambiguity about the precise geographic area WWC would service. The record shows that WWC acknowledged it could have "gaps" in service (areas where cellular phone service is unavailable), that it may need to enhance signal strength in areas, and that it would not know of signal strength until it visited customers. WWC provided a map showing its signal coverage area which it believed to be sufficient for the PSC to conclude that it would serve all customers in the service area. However, WWC did not provide any technical information about cell sites, capacities, transmitter power, or tower locations, information which would have enabled the PSC to verify its service area claims, even though a

wireless telecommunications company such as WWC would typically have such information. WWC admitted it had a tower location map but did not provide it to the PSC. WWC testified that ensuring adequate signal strength for customers is an ongoing process requiring analysis of tower locations, but did not provide any specific information about the results of such analysis in Utah. WWC also provided no specific information about the possible costs of ensuring that all customers had an adequate signal. The record also contains testimony that there are gaps in WWC's coverage and anecdotal accounts of gaps in coverage. This testimony is sufficiently substantial to support the PSC's finding that currently unserved areas would not be served by WWC. *See Harken,* 920 P.2d at 1180.

¶ 20 Thus, the PSC's conclusion that designation of WWC as a rural ETC would be detrimental to the State Fund and would not result in lower prices or new service to currently unserved areas is supported by substantial evidence in the record, as required by section 63–46b–16(4)(g) of the Utah Code. We therefore affirm these findings in the PSC's Order.

¶ 21 WWC further argues that the PSC's Order did not recognize other undisputed benefits, and that had these benefits been considered, the PSC's public interest determination would have been tipped in WWC's favor. Specifically, WWC argues that it proved that designating it as an additional rural ETC would result in the public benefits of increased competition, choice, mobility, and a larger local calling area. Regardless of the possible existence of these benefits, however, WWC has not cited any authority which requires the PSC to consider these specific factors in determining public interest. As discussed above, the PSC has been given statutory authority to determine which

factors to consider in determining public interest, and how those factors should be weighed to arrive at the ultimate conclusion. The PSC "is in a better position than the courts to give effect to the regulatory objective to be achieved," *Morton Int'l, Inc. v. Auditing Div.,* 814 P.2d 581, 586 (Utah 1991), that is, to determine what is, or is not, in the public interest with regard to rural ETC designation. As the PSC has been given this authority, and possesses " 'expertise gleaned from its accumulated practical, first-hand experience with the subject matter,' " *id.* at 587 (quoting *Bennett v. Indus. Comm'n,* 726 P.2d 427, 429 (Utah 1986)), we see no reason to require the PSC to consider specific factors, or to require that factors be given specific weights.

¶ 22 Furthermore, it appears that the PSC gave considerable weight to its finding that designation of WWC as an ETC would not result in service to currently unserved areas. The Order designates this benefit as "the primary potential benefit," suggesting that it was the principal consideration in concluding that designating WWC as an ETC would not bring offsetting public benefits. Given this, we see no reason to think that the result of the Order would have been any different, even if the PSC had been required to consider the public interest factors which WWC argues it ignored.[1] Thus, WWC has not been "substantially prejudiced" by the PSC's Order as required by section 63–46b–16(4).

¶ 23 The PSC appeared to be hindered throughout its decision-making process by the general problem that it had to determine public benefit by relying on WWC's assertions and promises rather than on objective documentation. For example, WWC did not provide specific documentation detailing service and equipment it intended to offer. WWC also did not provide service area cov-

---

1. Even if the PSC were required to consider these alleged benefits of WWC's designation as an ETC, they are not wholly uncontradicted in the record as WWC suggests. WWC asserted it would provide the public benefit of a larger local calling area than current phone companies. But WWC had not determined the local calling areas it would offer, had no knowledge of current local calling areas, and could not describe how or where WWC's local calling areas would be larg-

er. Likewise, WWC's assertion that the benefits of competition and choice were ignored can be overcome by the substantial evidence in the record supporting a conclusion that designating additional ETCs in rural areas, with no offsetting public benefits, which results in increased burdens on the State Fund, is not in the public interest. As for the claimed benefit of mobility, the record contains little for or against mobility as a benefit.

erage details, signal-strength models, projected costs for service, or sufficient documentation to enable the PSC to determine whether WWC would provide an adequate level of service at an affordable rate. It merely gave assurances that it would provide adequate service.

¶ 24 After a careful review of the record, we conclude that the PSC did not abuse its discretion in determining that impact on the State Fund was a public interest factor and that the PSC's findings of fact on this point are supported by substantial evidence in the record as detailed above. We further conclude that the PSC did not abuse its discretion in focusing only on certain public interest factors. Because we find that the PSC did not abuse its discretion in reaching its ultimate conclusion, we affirm the findings in the Order that it is not in the public interest to designate WWC as an additional ETC in rural areas currently served by incumbent ETCs.

## II. AFFORDABLE BASE RATES

¶ 25 We next address WWC's argument that the PSC should not have required WWC to price its universal service offering at or below the Affordable Base Rates in order to receive state universal service funds. Rule 746–360–6(B)[2] of the Utah Administrative Code requires that a carrier receiving state universal service support "may not charge retail rates in excess of the [PSC] determined Affordable Base Rates for basic telecommunications service...." The PSC's Order noted that WWC must meet this requirement to receive state universal service support funds and stated that it presumed that the Affordable Base Rates were represented by the rates previously set by the PSC for U.S. West in the relevant areas. WWC argues that this price cap requirement should be reversed because (1) Utah R746–360–6(B) is preempted by federal statute, and (2) the PSC should have established Affordable Base Rates through a rulemaking proceeding, rather than simply presuming

that the U.S. West rates represented the Affordable Base Rates.

¶ 26 Whether a state administrative rule is preempted by a federal statute is a question of law which we review under a correction of error standard. *See* Utah Code Ann. § 63–46b–16(4)(d)(1997). Whether a state administrative agency engaged in an unlawful decision-making process is also a question of law we review under the same standard. *See* §§ 63–46b–16(4)(e), –16(4)(d).

### A. No Federal Preemption

¶ 27 47 U.S.C. § 332(c)(3)(A) states, in relevant part, that "no State or local government shall have any authority to regulate the entry of or rates charged by any commercial mobile service...." WWC argues that this language preempts rule 746–360–6(B) of the Utah Administrative Code and that the PSC cannot, therefore, require WWC to price its universal service offering at or below specific rates. The PSC counters that § 332(c)(1)(A) provides that commercial mobile services are to be treated as common carriers and that, therefore, § 332(c)(3)(A) prohibits state entry or rate regulation only when a commercial mobile service is acting as a common carrier. The PSC asserts that ETC status is separate from common carrier status and that, therefore, § 332(c)(3)(A) is not applicable when a common carrier is acting as an ETC. We conclude that Utah R746–360–6(B) does not regulate entry or rates as contemplated by 47 U.S.C. § 332(e)(3)(A).

¶ 28 The term "regulate" is not defined by the statute. " 'This silence compels us to "start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used." ' " *Sec. Indus. Ass'n v. Bd. of Governors of the Fed. Reserve Sys.*, 468 U.S. 137, 149, 104 S.Ct. 2979, 82 L.Ed.2d 107 (1984) (quoting *Russello v. United States*, 464 U.S. 16, 21, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (quoting *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962))). The ordinary meaning

---

**2.** The rule cited by the PSC in its Order and by the parties in their briefs, Utah Admin. Code R746–360–7(B), was renumbered effective September 1, 2001 and is now Utah R746–360–6(B). We refer to the renumbered citation.

of the verb "regulate" in the context of administrative regulation embodies the concept of unilateral restriction or control. *See, e.g., Black's Law Dictionary* 1286 (6th ed. 1990)("Regulate: To fix, establish, or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws."); *Black's Law Dictionary* 1289 (7th ed.1999)("regulation: The act or process of controlling by rule or restriction.") Based on our understanding of the term "regulate," Utah R746–360–6(B) does not regulate WWC's rates.

¶ 29 While Utah R746–360–6(B) certainly has some effect on universal service offering rates, it does not unilaterally restrict or control the rates a commercial mobile service can charge for its services—the very essence of rate regulation. By requiring that an ETC receiving state universal service support price its universal service offering at or below the Affordable Base Rates, Utah R746–360–6(B) seeks to ensure that state funds are used to subsidize high-cost or low-income telecommunications service, rather than provide a windfall for the ETC receiving the support. Utah R746–360–6(B) concerns eligibility for state financial assistance and safeguarding state funds, not regulating rates. To achieve this end, Utah R746–360–6(B) is narrowly applicable only to telecommunications carriers who voluntarily seek ETC status and who voluntarily receive state funding. The rule is not a factor in determining ETC status or in eligibility for federal universal service support. Only if an ETC wishes to receive state universal service funds must it comply with Utah R746–360–6(B). An ETC becomes subject to the rate requirement only after it chooses to seek state funding. Because Utah R746–360–6(B) becomes applicable only under discrete, voluntary circumstances, the element of restriction or control is absent. It is therefore not rate regulation.

¶ 30 In this case the PSC is not regulating WWC's rates. WWC is free to set its rates without any state interference. Even after its voluntary decision to seek ETC status, WWC is still free to set its rates without state intervention. Only in the narrow instance of WWC's voluntary decision to receive state universal service support must it set the price of its universal service offering at or below a specified level. And, even while receiving state universal support, WWC is free to set the rates for other services without state intervention. Thus, Utah R746–360–6(B) is a condition imposed on the receipt of state funds rather than outright rate regulation. Because this condition does not constitute rate regulation, we hold that § 332(c)(3)(A) does not preempt Utah R746–360–6(B). The PSC may require WWC to price its universal service offering at or below the Affordable Base Rates under Utah R746–360–6(B) in order to be eligible for state financial subsidies.[3]

### B. Establishment of Affordable Base Rates

¶ 31 WWC argues that the PSC erred in presuming that the rates previously set by the PSC for the U.S. West telephone exchanges in the Order represented the Affordable Base Rates, and that the PSC should have established this rate through a formal rulemaking proceeding under the Utah Administrative Rulemaking Act ("UARA"), sections 63–46a–1 to –16 of the Utah Code. The allegation that the PSC "has engaged in an unlawful procedure or decision making process" is sufficient to allow us to review the agency's action. Utah Code Ann. § 63–46b–16(4)(e)(1997). However, because the UARA does not apply in this instance, we affirm the PSC's Order to the extent it equates the Affordable Base Rates with the rates previously set by the PSC for U.S. West.

¶ 32 WWC has not convinced us that the PSC engaged in rulemaking when it ordered that the Affordable Base Rates were represented by previously set rates. The UARA dictates when rulemaking is required and exempts "rulings by an agency in adjudicative proceedings." § 63–46a–2(17)(c)(vii)(Supp.2001). Such rulings are excluded from the UARA's definition of "rule" and are therefore not subject to the UARA. While WWC has argued that this portion of the PSC's Order is similar to a rule, it has not addressed the statutory exemption which

---

**3.** Because Utah R746–460–6(B) does not constitute rate regulation, we need not reach the issue of whether ETC status is different from common carrier status.

appears to be directly applicable here. This exemption for agency rulings comes with the proviso that "[e]ach agency shall enact rules incorporating the principles of law not already in its rules that are established by final adjudicative decisions within 120 days after the decision is announced in its cases." § 63–46a–3(6)(Supp.2001); *see also* § 63–46a–2(17)(c)(vii)(Supp.2001). We need not address the issue of the PSC's compliance with section 63–46a–3(6), however, as nothing in the record, the parties' briefs, or at oral argument addresses or mentions compliance with section 63–46a–3(6). *See, e.g., Springville Citizens for a Better Cmty. v. City of Springville*, 1999 UT 25, ¶ 20 n. 2, 979 P.2d 332 ("We do not address these issues because plaintiffs have failed to brief them adequately"). Thus, because the PSC's Order is a "ruling by an agency in [an] adjudicative proceeding[ ]," § 63–46a–2(17)(c)(vii)(Supp.2001), this portion of the Order is not a rule and, therefore, need not comply with the UARA. As this is the only ground upon which WWC attacks the PSC's presumption that the previously-set rates represent the Affordable Base Rates, we affirm the Order in this regard.

## CONCLUSION

¶ 33 The PSC did not abuse its discretion in considering impact on the State Fund in determining whether designation of WWC as an ETC would be in the public interest under 47 U.S.C. § 214(e)(2), and we defer to the PSC's expertise in the factors it chose to consider in determining what constitutes public interest. Because the PSC's findings are supported by substantial evidence in the record, we affirm its findings. Additionally, the PSC could properly require that WWC price its universal service offerings at or below the Affordable Base Rates as a prerequisite to receiving state universal service funds, and the PSC did not need to engage in a formal rulemaking proceeding to establish that rate. The PSC's Order is affirmed.

¶ 34 Chief Justice Howe, Associate Chief Justice Russon, Justice Durham, and Justice Durrant concur in Justice Wilkins' opinion.