2007 UT App 127

**LEVEL 3 COMMUNICATIONS, LLC, Petitioner,**

v.

**PUBLIC SERVICE COMMISSION and Qwest Corporation, Respondents.**

No. 20060042–CA.

Court of Appeals of Utah.

April 19, 2007.

---

Gregory L. Rogers, Broomfield, CO, and William J. Evans and Vicki M. Baldwin, Salt Lake City, for Petitioner.

Sander J. Mooy, Salt Lake City, for Respondent Public Service Commission.

Gregory B. Monson and Ted D. Smith, Salt Lake City, and David L. Elmont, St. George, for Respondent Qwest Corporation.

Before BENCH, P.J., GREENWOOD, Associate P.J., and DAVIS, J.

1. The terms and conditions of the Old Agreement were initially those of a previous contract between U.S. West—the predecessor of Qwest-and AT & T. As allowed by federal law, Qwest and

## OPINION

DAVIS, Judge:

¶ 1 Petitioner Level 3 Communications, LLC (Level 3) contests the decision of Respondent Public Service Commission (the Commission) interpreting an interconnection agreement (the Old Agreement) between Level 3 and Respondent Qwest Corporation (Qwest). We reverse and remand.

## BACKGROUND

¶ 2 On September 7, 2000, Qwest and Level 3 entered into the Old Agreement,[1] which provided, among many other things, that Level 3 would be responsible for the cost of jointly-used facilities called two-way direct trunks. The Old Agreement also provided, however, that payment would be reduced by Qwest's use of those facilities, measured by its percentage of use. Thus, each party would be responsible for its relative use of the direct trunk transport (DTT) facilities.

¶ 3 The parties subsequently modified the Old Agreement several times pursuant to its change-in-law provision. One modification was to add terms and conditions relevant to the establishment of Level 3's single point of presence in the Utah local access and transport area. A second modification was pursuant to an order issued by the FCC, determining that traffic bound for internet service providers (ISPs) was not to be included when calculating reciprocal compensation for the traffic exchange for local area calls. Neither of these modifications referenced the relative use calculation for the payment for use of the DTT facilities.

¶ 4 The Old Agreement expired on June 26, 2001, but pursuant to its terms, it continued in effect unless and until the parties entered into, and the Commission approved, another agreement (the New Agreement). In constructing the New Agreement, the parties were not able to agree on whether ISP-bound traffic should be included in the relative use calculation. Level 3 argued that Qwest's relative use should include all calls

Level 3 adopted those same terms and conditions to create the Old Agreement referenced herein. *See* 47 U.S.C. § 252(i) (2000).

originating from Qwest without exception—including ISP-bound traffic that originated from Qwest customers. And Qwest thought that ISP-bound traffic should be excluded from the calculation of relative use, reasoning that because Level 3 exclusively serviced ISPs, which only receive traffic, Level 3's relative use would be zero and Qwest would bear the entire cost of the DTT facilities despite the fact that Level 3 was benefitting from the ISP-bound traffic transported over the facilities.

¶ 5 An arbitration proceeding was held in relation to this disagreement, following which, on February 20, 2004, the Commission issued an order determining that ISP-bound traffic would be excluded from the relative use calculation for the DTT facilities. As to the effective date of the new form of calculation, the Commission determined in its 2004 order that the new calculation should apply only prospectively. The issue was thus resolved, and the New Agreement became effective on the same date the order was issued—February 20, 2004.

¶ 6 During negotiations and arbitration of the New Agreement, and while the parties were still conducting business under the Old Agreement, Qwest billed Level 3 for the use of the DTT facilities, including ISP-bound traffic. Level 3 withheld payment of such charges over the disputed period of July 1, 2002, through February 10, 2004. On June 13, 2005, Qwest demanded payment from Level 3 in the amount of $563,616.99 for charges arising during the disputed period, and Qwest threatened to discontinue service if payment was not promptly made. Level 3 quickly petitioned to enjoin Qwest from discontinuing service and to obtain a declaratory order that Level 3 was current on payments for the DTT facilities, i.e., that under the plain language of the Old Agreement, Level 3 was not financially responsible for the usage generated by ISP-bound traffic. Qwest counter-claimed, seeking an order declaring that the payment plus interest was

due, i.e., that Level 3 was indeed responsible for usage generated by ISP-bound traffic.[2]

¶ 7 After briefing and a hearing on the matter, the Commission issued an August 18, 2005 order in favor of Qwest, in which the Commission used extrinsic evidence to interpret the Old Agreement as providing that ISP-bound traffic should be excluded from the calculation. Level 3 filed a Motion for Reconsideration and Rehearing on September 19, 2005. The motion was deemed denied on December 16, 2005, and Level 3 timely petitioned for appellate review.

¶ 8 On February 13, 2006, Qwest filed its Notice of Removal in the United States District Court for the District of Utah. After briefing and a hearing, the federal district court issued an order, stating:

> The court finds that there is no federal question on the face of Level 3's Petition, its claims were not created by federal law, and also that Level 3's right to relief does not depend on resolution of a substantial question of federal law. Rather, the resolution of this dispute depends upon state contract law.

Thus, based on the absence of subject matter jurisdiction, the federal district court remanded the case for further action by the state appellate courts.

## ISSUE AND STANDARD OF REVIEW

¶ 9 Level 3 argues that the Commission erred by using extrinsic sources-including inapplicable federal law, an FCC order, and the Commission's 2004 arbitration order regarding the New Agreement-to interpret the Old Agreement. Level 3 argues that, instead, Utah contract law requires that the unambiguous contract term be given its plain meaning and be interpreted in favor of Level 3. "Whether ambiguity exists in a contract is a question of law." *Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991).

¶ 10 When reviewing the Commission's interpretation or application of law, we

---

2. The parties do not dispute the resulting effects of their varying interpretations of the clause regarding relative use. They both agree that if ISP-bound traffic is determined to be included in the calculation of relative use, then all of the minutes of the DTT facility usage originate from Qwest customers, and Qwest is thus responsible for the full cost of the DTT facilities during the disputed period.

apply differing standards of review. "[W]here the legislature has explicitly or implicitly delegated discretion to the agency to interpret or apply that law [at issue], an intermediate deference standard of review is applied." *Elks Lodges No. 719 (Ogden) & No.2021 (Moab) v. Department of Alcoholic Beverage Control*, 905 P.2d 1189, 1193 (Utah 1995). But "absent a grant of discretion, legal issues are reviewed under a correction-of-error standard. This standard is especially appropriate where the agency possesses no special expertise which would place it in a better position than the court to decide the issue." *WWC Holding Co. v. Public Serv. Comm'n*, 2001 UT 23, ¶ 8, 44 P.3d 714 (citations omitted).

¶ 11 We agree with the United States District Court for the District of Utah that "the resolution of this dispute depends upon state contract law." The Commission has not been delegated discretion to interpret or apply general contract law, and the Commission is in no better position than is this court to interpret the contractual language at issue here. Thus, we review for correctness, granting no deference to the Commission's determination.[3]

## ANALYSIS

¶ 12 The general rule is that when "interpreting a contract, the intentions of the parties are controlling." *Winegar*, 813 P.2d at 108. The method for determining this intent is dependent on whether the contract is ambiguous. "If the contract is in writing and the language is not ambiguous, the intention of the parties must be determined from the words of the agreement. A court may only consider extrinsic evidence if, after care-

ful consideration, the contract language is ambiguous or uncertain." *Id.* (citations omitted). We agree with Level 3 that the contract language here is unambiguous.

¶ 13 "A contract provision is ambiguous if it is capable of more than one reasonable interpretation because of 'uncertain meanings of terms, missing terms, or other facial deficiencies.'" *Id.* (quoting *Faulkner v. Farnsworth*, 665 P.2d 1292, 1293 (Utah 1983)). To determine whether a contract provision is ambiguous, we may look to evidence beyond the language of the contract. But "'[t]he only evidence relevant to that inquiry is evidence of the facts known to the parties at the time they entered the [agreement].'" *Peterson v. Sunrider Corp.*, 2002 UT 43, ¶ 19, 48 P.3d 918 (second alteration in original) (quoting *Yeargin, Inc. v. Utah State Tax Comm'n*, 2001 UT 11, ¶ 39, 20 P.3d 287). Ambiguity will then be found "'[i]f after considering such evidence the court determines that the interpretations contended for are reasonably supported by the language of the contract.'" *Id.* (quoting *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268 (Utah 1995)).

¶ 14 Here, there was no evidence presented regarding facts pertaining to the relative use calculation that were known to the parties at the time they entered into the Old Agreement. It is clear that the parties simply adopted the terms and conditions of an agreement already in existence, and that the parties had no need for any of those terms or conditions to be arbitrated by the Commission.[4] Under such circumstances, we are left only with the language of the agreement

---

3. Additionally, pursuant to the Utah Administrative Procedures Act, Utah Code Ann. §§ 63–46b–0.5 to –23 (2004 & Supp.2006), we may grant relief only if we determine that Level 3 has been "substantially prejudiced" by the misinterpretation or misapplication of the law. *Id.* § 63–46b–16(4) (2004). Because the argued misapplication here would require a half-million dollar payment by Level 3, such prejudice is obvious.

4. Qwest argues that in the original agreement, from which the Old Agreement was taken, the clause regarding relative use was actually arbitrated, not negotiated. Qwest thus reasons that since the clause was originally arbitrated, it was

appropriate for the Commission to consider the federal requirement that rates paid to Qwest be "just and reasonable," 47 U.S.C. § 252(d)(1). *See id.* § 252(c)(2) (providing that those rates established by arbitration must meet the "just and reasonable" standard of subsection (d)). This argument, however, relies on parts of the Old Agreement that were not included in the record below and that were stricken from Qwest's brief on appeal. We therefore do not consider these other portions of the Old Agreement, nor do we address any effect that an arbitration of the relative use clause may have had on the instant case.

itself to determine the existence of ambiguity.

¶ 15 The clause of the Old Agreement that addresses the relative use calculation provides, in its entirety:

If the Parties elect to establish two-way direct trunks, the compensation for such jointly used "shared" facilities shall be adjusted as follows. The nominal compensation shall be pursuant to the rates for [DTT] in Appendix A. The actual rate paid to the provider of the [DTT] facility shall be reduced to reflect the provider's use of that facility. The adjustment of the [DTT] rate shall be a percentage that reflects the provider's relative use (i.e., originating minutes of use) of the facility in the busy hour.

We see no uncertain meaning in these terms. The language is clear that ISP-bound traffic is not excluded and that Qwest is therefore financially responsible for its relative use of the facilities. The language additionally specifies that such relative use is calculated using originating minutes. There is simply nothing within the clause that supports the interpretation that the term "originating minutes of use" really means "originating minutes less any ISP-bound originating minutes," nor do we see any indication that ISP-bound traffic was to be treated differently than other forms of traffic. Further, the meaning of the relative use clause is not uncertain simply because the parties now dispute its meaning. *See Buehner Block Co. v. UWC Assocs.*, 752 P.2d 892, 895 (Utah 1988) ("Contract terms are not necessarily ambiguous simply because one party seeks to endow them with a different meaning than that relied upon by the drafter.").

¶ 16 The fact that the Old Agreement is silent respecting the effect of ISP-bound traffic does not alone render the contract ambiguous. Certainly a contract need not "negate every possible construction of its terms in order to be unambiguous." *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996) (quotations and citation omitted). The clause

does not specifically say that ISP-bound traffic is to be included in the relative use calculation. But it does state that Qwest must pay for its originating minutes of use, without providing any limitation or any suggestion that those minutes include anything less than *all* originating minutes of use. Under such language, Qwest is clearly assigned responsibility for all of its originating minutes of use, without exception.

¶ 17 Thus, looking at the plain language of the relative use clause, we see no " 'uncertain meanings of terms, missing terms, or other facial deficiencies,' " *Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991) (citation omitted), that would render Qwest's interpretation reasonably supported by that plain language. We therefore determine that the relative use clause unambiguously supports Level 3's interpretation.[5]

## CONCLUSION

¶ 18 The relative use clause of the Old Agreement is unambiguous regarding which party is responsible for the cost of the DTT facilities. The Commission therefore erred in looking to extrinsic evidence to apportion cost between the parties. We reverse and remand for further proceedings consistent with this opinion.

¶ 19 WE CONCUR: RUSSELL W. BENCH, Presiding Judge and PAMELA T. GREENWOOD, Associate Presiding Judge.

5. Level 3 presents various other arguments regarding the extrinsic evidence the Commission used in arriving at its determination below. Because we hold that the relative use clause here is unambiguous, the Commission's resort to extrinsic evidence was in error, and we need not address Level 3's arguments concerning such extrinsic evidence.