2002 UT 129

## DIVERSIFIED HOLDINGS, L. C., Plaintiff, Appellee and Cross–Appellant,

v.

## Gilbert R. TURNER, Richard M. Knapp, University Properties, Inc., a Utah Corporation, The Haws Companies, a Utah Corporation, dba The Haws Companies Real Estate Services, Robert M. West, Jr., and John Does 1 through 4, Defendants, Appellants, and Cross–Appellees.

Nos. 20000730, 20010021.

Supreme Court of Utah.

Dec. 27, 2002.

Blake S. Atkin, Salt Lake City, for plaintiff.

D. Miles Holman, Jeffrey N. Walker, Salt Lake City, for defendants.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 After a trial on claims of negligence and fraud, the trial court remitted the amounts of the jury's verdicts regarding both compensatory and punitive damages. The defendants have appealed and plaintiffs have cross-appealed, both challenging the amount of the damage awards. We affirm in part and reverse in part.

## BACKGROUND

¶ 2 "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict...." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611. This case arises from a real estate transaction in which the plaintiff, Diversified Holdings (Diversified), was manipulated into paying substantially more for a property than was necessary. Two of the defendants, Gilbert Turner (Turner) and Richard Knapp (Knapp), represented the purchase price of a building in which Diversified was interested as $785,000, when in fact a third defendant, University Properties, which was owned by Knapp, was acquiring that property (for the purpose of selling it to Diversified) for $700,000. Turner and Knapp informed Diversified that they would sell the property for $10,000 more than they had (through University Properties) paid for it, and persuaded Diversified to pay a higher price than it had expected. The final defendant, the Haws Companies Real Estate Services (Haws), employed both Turner and Knapp as real estate agents, failed to train or supervise them properly, and made little or

no effort to correct their conduct even after its discovery of their fraudulent behavior. The undisputed testimony of two expert witnesses regarding the regulation of the real estate industry attributed to Haws numerous improprieties and oversights in supervision, training, and response to irregularities. Several weeks after the sale, Diversified became aware of problems associated with the purchase of the building and began the inquiries that culminated in this lawsuit.

¶ 3 A jury found all four defendants jointly and severally liable for fraud damages, and awarded negligence and punitive damages against each defendant individually. Upon the defendants' motion, the trial judge remitted the negligence and punitive damages against each defendant except Haws. On appeal, the defendants allege a number of errors by the trial court and argue that the remitted award remains excessive. The plaintiffs cross-appeal, arguing that the jury's original awards should be restored.

## STANDARD OF REVIEW

¶ 4 The claims we reach here are governed by different standards of review. A trial judge's discretion under Utah Rule of Civil Procedure 59 to propose a remittitur of *compensatory* damages is considerable. *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 803–04 (Utah 1991) (*Crookston I*). Having been present for all phases of the trial, the trial judge is in the best position to ascertain if the jury has "exceeded its proper bounds," and we will reverse "only if there is no reasonable basis for the decision." *Id.* at 804, 805 (citations omitted).

¶ 5 Awards of punitive damages are assessed with regard to the seven factors enumerated in *Crookston I. Id.* at 808. In light of the recent United States Supreme Court holding that federal due process requires de novo review of punitive damage awards appealed on constitutional grounds, *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), we have adopted a de novo standard for reviewing both awards of punitive damages by juries and also adjustments of those awards by trial courts. *Campbell v. State Farm Mut. Auto. Ins. Co.*, 2001 UT 89, ¶ 13, 432 Utah Adv. Rep. 44, 65 P.3d 1134, *cert. granted*, 535 U.S. 1111, 122 S.Ct. 2326, 153 L.Ed.2d 158 (2002).

¶ 6 We review a trial court's decision to admit or exclude evidence under Rule 403 of the Utah Rules of Evidence under an abuse of discretion standard, and will not overturn a lower court's determination of admissibility unless it is "beyond the limits of reasonability." *State v. 633 East 640 North*, 942 P.2d 925, 930 (Utah 1997) (quoting *State v. Hamilton*, 827 P.2d 232, 239–40 (Utah 1992)).

## ANALYSIS

### I. INTEGRATION CLAUSE AND RECOVERY FOR FRAUD

¶ 7 Defendants argue that plaintiff's decision to affirm a contract containing a merger clause after the fraud was discovered precludes them from suing for fraud. They maintain that the defrauded party must rescind the contract to preserve the right to sue for fraud; if the aggrieved party elects to affirm the contract, that party is then limited to the remedies available under the contract. Jury instruction 41 expressly contradicted this position at trial, informing the jury that "[a]n integration clause in a contract between the parties does not bar recovery for fraud or negligent misrepresentation." Although given an opportunity to do so, counsel not only failed to object to this instruction, but also affirmatively indicated that the argument now raised on appeal would not be made.[1]

¶ 8 The rules of civil procedure require a party to preserve an objection to a jury instruction for appeal absent special circumstances; unless a "party objects to an instruction or the failure to give an instruction, the instruction may not be assigned as

---

1. With regard to jury instruction 41, counsel for the plaintiff commented to the judge that "I wouldn't want to hear in closing argument that because there was this integration clause my clients are precluded from being able to prove fraud." Counsel for defendant responded "I won't make the argument." The law firm of Holman & Walker, representing defendants on

error except to avoid a manifest injustice." Utah R. Civ. P. 51(d). While Rule 51(d) does permit us to review instructional errors in the interests of justice ... "it is incumbent upon the aggrieved party to present a persuasive reason" for exercising that discretion ... and this requires "showing special circumstances warranting such a review."

*Crookston I*, 817 P.2d 789, 799 (quoting *Hansen v. Stewart*, 761 P.2d 14, 17 (Utah 1988)). The rule applies in both criminal and civil contexts; we observe the "general rule that 'issues not raised at trial cannot be argued for the first time on appeal.' " *Monson v. Carver*, 928 P.2d 1017, 1022 (Utah 1996) (quoting *State v. Lopez*, 886 P.2d 1105, 1113 (Utah 1994)). The defendants on appeal do not address the waiver issue however, and do not make a showing that there are special circumstances justifying this court's review. The issue was therefore not preserved for appeal.

## II. THE EXCESSIVENESS OF THE NEGLIGENCE AWARD

■ ¶ 9 The trial court remitted the jury's total award against all defendants of $210,000 in negligence damages to $65,000 under Utah Rule of Civil Procedure 59(a)(6),[2] finding there was no evidence that plaintiff had suffered more than that as a result of defendants' negligence. The court reached the remitted amount by subtracting the amount Diversified paid for the property ($785,000)

from the (revised) evaluation of its worth offered by the principal who represented Diversified in the sale ($650,000). From the resulting difference of $135,000, the judge subtracted $70,000 attributable to fraudulent misrepresentation, and $1,336 interest charged on a loan that was part of the scheme. The remaining $65,000, according to the trial court, could be sustained as damages resulting from the defendants' negligence in not working zealously to obtain the best purchase price for their clients. The trial court found that there "was no other evidence of damage presented or argued to the jury."

¶ 10 Plaintiff cross-appeals on the propriety of the negligence award, arguing that there was other evidence on which the jury properly could have based its original $210,000 award of negligence damages. Plaintiff is precluded from raising this argument, however, by our case law. Having opted to accept the remittitur of negligence damages made by the trial court instead of having a new trial, plaintiff cannot now challenge the amount of the damages on cross-appeal. In *Dalton v. Herold*, 934 P.2d 649 (Utah 1997), we held that a party who accepts an adjusted amount cannot thereafter appeal the propriety of the order.[3] We relied in part on *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977), where the United States Supreme Court held that "a plaintiff in federal court, whether prosecuting a state or federal cause of action, may not appeal from a remittitur

appeal, did not become involved in this case until after the jury verdict was rendered.

**2.** A new trial may be granted if the court finds "[i]nsufficiency of the evidence to justify the verdict or other decision." Utah R. Civ. P. 59(a)(6) (2002). Rule 59 does not speak to a trial judge's discretion to remit the amount of a damage award; the ability to offer a remittitur as an alternative to a new trial is a common-law development.

> Trial courts ... grafted on to that provision [giving courts the ability to order a new trial] the right of the trial court to refuse to grant a new trial when the damages were excessive, if the winning party would consent to a reduction. The provision was thus extended by judicial decision to permit trial courts to require a remission of part of the damages or suffer the consequences of a new trial.

*State Road Comm'n v. Johnson*, 550 P.2d 216, 217 (Utah 1976). The federal courts follow a similar procedure,

> now sanctioned by long usage, by which the court may condition a denial of the motion for a new trial upon the filing by the plaintiff of a remittitur in a stated amount. In this way the plaintiff is given the option of either submitting to a new trial or of accepting the amount of damages that the court considers justified. This practice goes back to the opinion of Justice Story sitting at circuit in 1822.... A number of Supreme Court decisions accepted Justice Story's view uncritically and the power of the court to set a remittitur has been uniformly accepted by the lower federal courts.

11 Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 2815 (2d ed.1995).

**3.** *Dalton* addressed an additur, in which the trial judge augmented the amount awarded by the jury, and we approved the application of established remittitur law in that context.

order he has accepted."[4] *Id.* at 650, 97 S.Ct. 835.

¶ 11 In *Terry v. Zions Coop. Mercantile Institution,* 605 P.2d 314 (Utah 1979), *rev'd on other grounds,* 678 P.2d 298 (Utah 1984), this court noted an exception to the general rule, that "[w]here the party who moves for the reduction, i.e. the defendant, institutes an appeal of the lower court proceedings, the plaintiff should be free to cross-appeal the amount of remittitur, notwithstanding the fact that he has previously accepted the reduced amount." *Id.* at 326. That exception does not apply in the instant case. Defendants have not assigned as error the amount of negligence damages as remitted by the trial court. Defendants have assailed the amount of punitive damages, and plaintiff is therefore free to argue in favor of the amounts found and assessed by the jury. However, plaintiff cannot on cross-appeal assail the negligence damages which were remitted by the trial court, which amount plaintiff accepted in lieu of a new trial, and which amount defendants do not seek to disturb.

## III. THE EXCESSIVENESS OF THE PUNITIVE DAMAGE AWARD

¶ 12 In *Crookston I,* we identified seven factors which aid a finder of fact in the first instance and a reviewing court on a motion for a new trial or on appeal in determining the appropriate scope of an award of punitive damages. A jury, trial court, or appellate court must consider

(i) the relative wealth of the defendant; (ii) the nature of the alleged misconduct; (iii) the facts and circumstances surrounding such conduct; (iv) the effect thereof on the lives of the plaintiff and others; (v) the

probability of future recurrence of the misconduct; (vi) the relationship of the parties; and (vii) the amount of actual damages awarded.[5]

*Crookston I,* 817 P.2d at 808. While these factors do not comprise an exclusive list, nor carry decisive weight individually, all factors must be considered, and a justification of a substantial award will generally be couched in terms of one or more of these factors. *Campbell,* 2001 UT 89 at ¶ 19, 65 P.3d 1134; *Crookston v. Fire Ins. Exch.,* 860 P.2d 937, 940 (Utah 1993) (*Crookston II* ); *Crookston I,* 817 P.2d at 808.

¶ 13 One of the four defendants, Gilbert Turner, has not appealed the trial judge's remittitur; we therefore consider only the level of punitive damages awarded against the remaining three defendants.

### A. Richard M. Knapp

¶ 14 The jury awarded $1,750,000 in punitive damages against Knapp; the trial judge remitted the award to $500,000, observing that the resulting ratio of punitive to actual damages of slightly over five to one was appropriate given Knapp's wealth and the likelihood that he would engage in similar conduct in the future if not subjected to a substantial award of punitive damages. While we appreciate the trial judge's careful consideration of the *Crookston I* factors, we hold that the remitted award with regard to Knapp remains excessive.

#### 1. The Relative Wealth of the Defendant

¶ 15 Our cases have determined that a defendant's wealth can be either an aggravating or a mitigating factor in determining the size of a punitive damage award, since puni-

4. We note that several other states have now adopted a rule allowing a plaintiff to appeal a remittitur directly. This rule, it is argued, protects a plaintiff's state constitutional right both to a jury trial and to an appeal from a final order affecting substantial rights, while the federal procedure forces a successful plaintiff to choose between the expense and uncertainties of a new trial and a remitted award, while insulating the trial court's remittitur from appellate review. *See Allsups's Convenience Stores, Inc. v. North River Ins. Co.* 127 N.M. 1, 976 P.2d 1, 14 (1998); *Robinson v. Old Dominion Freight Line, Inc.,* 236 Va. 125, 372 S.E.2d 142, 142 (1988); *Harmon v.*

*Motors Ins. Corp.,* 493 So.2d 1370, 1372 (Ala. 1986); *Stilwell v. Williams,* 476 So.2d 24, 25 (Miss.1985). Neither party has raised or briefed the question of whether this court should reconsider its position, and we therefore do not address it here.

5. We are indebted to the trial court for its thorough consideration of the *Crookston I* factors, but note that it did not instruct the jury regarding those factors. If juries are instructed regarding the *Crookston I* factors, the need for trial courts to grant remittiturs may be diminished.

tive damages should be tailored to what is necessary to deter the particular defendant, as well as others similarly situated, from repeating the prohibited conduct. *Campbell,* 2001 UT 89 at ¶¶ 23–24, 65 P.3d 1134. Evidence adduced at trial puts Knapp's worth at $5,000,000. While the evidence relating to the wealth of the other defendants was less complete, Knapp appears to be the wealthiest by a significant margin. In setting the remitted award at 10% of Knapp's estimated worth, the trial court intended "to send a very strong message regarding future conduct" without putting Knapp at risk of bankruptcy. An extremely wealthy defendant may require a larger award of punitive damages to be deterred from further misconduct; we have recently taken the great wealth of a defendant as a factor tending to support a large award of punitive damages. *Id.* at ¶ 26. The wealth of the defendant in *Campbell,* however, was of a completely different order of magnitude than that of Knapp.[6] The ratios between punitive and actual damages we have determined to be presumptively appropriate are generally sufficient to ensure that awards of punitive damages both punish and deter the conduct on which defendants' liability is based. *See Crookston II,* 860 P.2d at 940 ("That pattern was considered adequate to provide compensation which would make the victims whole while punishing and deterring the tort-feasors") (citations omitted). The presence of substantial personal or corporate assets is not alone sufficient to require an award that exceeds those ratios.[7]

**2. The Nature of the Misconduct**

■ ¶ 16 The jury found Knapp and Turner inflated by $70,000 the purchase price of the property they acquired to sell to Diversi-

fied. Within a few weeks after the purchase closed, Diversified learned of the actual price paid by defendants and ultimately instituted the legal proceedings culminating in this appeal. While punitive damages may appropriately be awarded for fraud, the imposition of an award so disproportionate to the actual damages suffered must be justified by more than the mere fact of fraud. Both the United States Supreme Court and this court have recognized that, within the broader class of actions that merit not only actual, but exemplary damages, there is a subset of particularly egregious behaviors that will attract more severe sanctions. We have countenanced awards that appeared disproportionate at first blush when the conduct grounding the defendants' liability was but a particular instance of an invidious pattern affecting victims both numerous and peculiarly vulnerable to the defendants' machinations. *See Campbell,* 2001 UT 89 at ¶ 27, 65 P.3d 1134; *Crookston II,* 860 P.2d at 941. While the fraud perpetrated here is sufficient to justify both compensatory and punitive damages, appellant's conduct lacks those additional elements of blameworthiness that would sustain more substantial punitive damages. The victim of Knapp's deceit was not a vulnerable individual, but a corporation, represented in this transaction by two men with substantial experience in both business and real estate transactions.[8]

■ ¶ 17 Behaviors that undermine the efficiency and integrity of the judicial process may also be considered under the rubric of the second *Crookston I* factor; in *Campbell* we singled out for censure the defendant's systematic destruction of documents related to its challenged activities and its policy of

---

6. The defendant in *Campbell* was the insurer, State Farm, whose assets were estimated at $54.75 billion in 1995. *Campbell,* 2001 UT 89 at ¶ 26, 65 P.3d 1134.

7. The Seventh Circuit has suggested that 1% of a corporation's net worth is an appropriate guideline for a typical punitive damage award. *Cash v. Beltmann N. Am. Co.,* 900 F.2d 109, 111, n. 3 (7th Cir.1990). As we observed in *Campbell,* such guidelines, while not dispositive "are helpful in reviewing punitive damage awards." *Campbell,* 2001 UT 89 at ¶ 23, 65 P.3d 1134. It is not immediately apparent that an individual

would require a greater degree of deterrence, as embodied in an award representing a greater proportion of individual assets, than would a corporation.

8. The trial court noted that one of the principals for the plaintiffs was the chief executive officer of a company he founded and (principally) owned, and had owned or been involved with a number of other corporations. The other principal had engaged in a number of real estate transactions, including the purchase and subsequent sale of a duplex, a four-plex and a six-plex.

harassing and exhausting legal opponents. *Campbell,* 2001 UT 89 at ¶¶ 30–31, 65 P.3d 1134. The facts of the instant case are not suggestive of similar systematic efforts to hinder the litigation process.

 ¶ 18 The United States Supreme Court has recently distinguished between punitive damage awards that respond to purely economic harms and those aimed at crimes involving actual or threatened violence or deceit. *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

> [I]nfliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty. But this observation does not convert all acts that cause economic harm into torts that are sufficiently reprehensible to justify a *significant* sanction in addition to compensatory damages.

*Id.* at 576, 116 S.Ct. 1589 (emphasis added) (citations omitted). Knapp, while certainly guilty of affirmative acts of misconduct, did not target vulnerable victims or otherwise act in a manner "sufficiently reprehensible" to merit substantial punitive damages. Punitive damage awards should reflect a different degree of culpability for "garden-variety" fraud as opposed to its more egregious forms.

3. Facts and Circumstances Surrounding Defendants' Misconduct

 ¶ 19 The third *Crookston I* factor supplements the second's objective assessment of the defendant's conduct with a more subjective inquiry into "what the defendant knew and what was motivating his or her actions." *Campbell,* 2001 UT 89 at ¶ 35, 65 P.3d 1134. While defendant's motive of making money regardless of legal or professional duties is hardly admirable, there is, again, no evidence of intentions or actions so profoundly reprehensible as to merit punitive damages beyond ordinary measures. In suggesting that the award of punitive damages against Knapp should be further remitted we

do not disturb the finding of the jury and the trial court that Knapp's actions were both culpable and reprehensible; we do point out, however, that this degree of culpability and reprehensibility does not merit punitive damages significantly outside the ratios outlined in *Crookston I.*

4. Effect of Defendant's Conduct on Plaintiffs and Others

 ¶ 20 Knapp's conduct did not have the widespread effect on groups of vulnerable victims or a devastating impact on the plaintiff that would justify an award outside the range usually deemed adequate for purposes of punishment and deterrence. "The larger the number of people affected, the greater the justification for higher punitive damages." *Campbell,* 2001 UT 89 at ¶ 37, 65 P.3d 1134.

5. Probability of Future Recurrence

 ¶ 21 It is on this ground that the argument for a substantial award of punitive damages is most compelling. While the standard of review for this factor, as for all the other factors, remains de novo, the trial court's detailed findings and its privileged position have provided the best argument for assessing substantial punitive damages against Knapp. The trial court found that Knapp "demonstrated an incredibly arrogant and uncaring attitude on the stand when asked about the lies and half-truths propounded by Mr. Turner [at] his behest." Moreover, Knapp "absented himself from the proceedings" once the jury found that punitive damages were warranted; he did not attend the trial during the presentation of evidence or argument related to the amount of punitive damages. While Knapp's absence may bear a benign interpretation, it is certainly equally susceptible to that placed on it by the trial court, that he holds in contempt any legal procedure that would censure his conduct.[9] The trial court was concerned that a smaller award would not penalize Knapp sufficiently to deter him from repetition of his conduct. Knapp does not ordinarily, nor

---

9. His decision not to attend trial "was not lost on the jury or the Court. This Court concludes that unless Mr. Knapp changes his conduct and atti- tude a very real possibility exists that Mr. Knapp will seek and exploit circumstances such as this on a future occasion."

did he in this transaction, hold himself out as a real estate agent. The trial court observed that while Turner's surrender of his real estate license will prevent him from working as an agent, Knapp could continue to engage in real estate transactions despite the outcome of this case.

¶ 22 While it is true that the loss of the capacity to act as a real estate agent will affect Turner more dramatically than Knapp, it does not follow that the outcome of this case will not significantly affect Knapp's professional prospects. A judgment based on fraud will no doubt have some detrimental effect on Knapp's reputation in the relevant business communities as well as on his prospects for putting his recently completed law and business degrees to use. These consequences may give Knapp some pause before he chooses to pursue fraudulent courses of action in the future. In *Campbell* we considered State Farm's "decades-long policy of fraudulent and dishonest policies" and the difficulty of altering "ingrained policies of corporate culture" to be aggravating circumstances helping justify a more substantial award of punitive damages than we would ordinarily allow. *Campbell*, 2001 UT 89 at ¶ 41, 65 P.3d 1134. While mindful of the trial court's opportunity to observe Knapp and draw legitimate inferences from those observations, we are unconvinced that the possibility of Knapp's recidivism supports a result different from that which an analysis of the other six *Crookston* factors suggests.

6. Relationship of the Parties

■■■ ¶ 23 Several aspects of the relationship between plaintiff and defendant can affect the damages assessed against a defendant. The greater the trust reposed in a defendant, the greater will be the justification for a more significant award of punitive damages. *Campbell*, 2001 UT 89 at ¶ 44, 65 P.3d 1134. The breach of a fiduciary rela-

tionship also justifies higher punitive damages. *Id.* A real estate agent does owe "a duty, independent of any implied or express contracts, to be 'honest, ethical, and competent' " in dealings with purchasers. *Hermansen v. Tasulis*, 2002 UT 52, ¶ 22, 48 P.3d 235 (quoting *Dugan v. Jones*, 615 P.2d 1239, 1248 (Utah 1980)). This duty is not a fiduciary duty, however: "[u]nder Utah law, the general rule is no fiduciary obligations exist between a buyer and seller of any property." [10] *Dugan*, 615 P.2d at 1248. Here the client was a corporation represented by two experienced businessmen, not an inexperienced and vulnerable individual. While purchasers of real estate, whether individual or corporate, certainly have a right to expect that sellers and their agent will refrain from fraudulent practices, an experienced purchaser of a commercial property is not in a position of peculiar dependence on the trustworthiness of a seller or agent, a position this factor is intended to vindicate.

7. Ratio of Punitive to Compensatory Damages

■■■ ¶ 24 The ratio of punitive to compensatory damages does not, by itself, determine whether or not an award is excessive; an award that falls outside certain parameters will, however, elicit more searching judicial scrutiny. *Campbell*, 2001 UT 89 at ¶ 49, 65 P.3d 1134; *Crookston I*, 817 P.2d at 810. For punitive awards of less than $100,000 a ratio of three to one will generally be justifiable, but for awards greater than $100,000, a somewhat lower ratio is usually appropriate.[11] *Crookston I*, 817 P.2d at 810. Even after the trial judge's remittitur, all the punitive damage awards in this case exceed $100,000, thus triggering more searching judicial scrutiny.[12]

■■■ ¶ 25 While our case law identifies the ratios against which awards of punitive

---

**10.** Knapp did not hold himself out as a real estate agent in this sale, but as the principal of University Properties which acquired the property to sell it to Diversified.

**11.** These ratios are intended to be flexible guidelines, not rigid formulae. For awards of greater than $100,000 "we have indicated some inclination to overturn awards having ratios of less than

3 to 1," but that inclination may be overcome by appropriate facts. *Crookston I*, 817 P.2d at 810. Juries and judges require flexibility if they are to fashion awards of damages appropriate to all the circumstances of a particular case.

**12.** The remitted awards range from $130,500 against Haws to $500,000 against Knapp.

damages are to be assessed, the briefs of the parties, as well as the trial court's remittitur, reveal some disagreement as to how the ratio should be calculated. Plaintiff argues that, where there are multiple defendants, the "actual damages" against which punitive damages are measured should consist of the total fraud damages added to the total negligence damages for *all* defendants. Using this method, higher awards of punitive damages would be sustained, since the actual damages would be increased by the inclusion of all the defendants' individual negligence awards.[13]

¶ 26 Defendants suggest that the proper measure of actual damages is the award of $71,336 that the jury found to be the result of the defendants' fraudulent actions.[14] Under this model, with the exception of the award against Haws, even the remitted awards exceed or come very near to exceeding the ratios we established in *Crookston I*.[15]

¶ 27 The trial court relied on yet a third approach in calculating actual damages, suggesting that the actual damages against which a particular defendant's punitive damages should be assessed is the sum of the total fraud damages and the individual negligence damages assessed against that defendant. The remitted awards under this approach, with the exception of Knapp's, are more closely aligned with the presumptive ratios.[16]

¶ 28 The difficulty with plaintiff's theory is that it allows an award of punitive damages to be sustained against an individual defendant that is based in part on the negligence of others. While plaintiff does argue that it sustained the total $210,000 loss the jury awarded in negligence damages, it does not offer, nor would it be easy to offer, an argument for why a higher award of punitive damages against Knapp should be justified by the negligence of three other defendants. When multiple defendants are jointly and severally liable for fraud damages, as they are here, the full amount of that joint and several liability may form the basis of the actual damages against which punitive damages are assessed for each defendant. When multiple defendants are not jointly and severally liable, as they are not for negligence damages, one defendant's liability should not be a predicate for increasing punitive damages assessed against another.

¶ 29 The trial court's inclusion of individual negligence damages as a compo-

13. Plaintiff's calculations yield results generally still outside our ratios with regard to the jury award (Turner 6.7:1; Knapp 5.2:1; University 2.9:1; Haws .39:1). The remitted awards ordered by the trial judge, with the exception of that against Knapp, fall within acceptable ratios under this computation: Turner 1.5:1; Knapp 3.7:1; University 1.6:1; Haws .96:1.

14. Defendants offer an additional model in which the punitive damages assessed against all (jointly and severally liable) defendants are added and compared to the total damage suffered as a result of the fraud. Defendants point out, correctly, that any of the other calculations proposed will result in higher awards of punitive damages, since in all of the other calculations the punitive damage award for each of four defendants is compared with the full $71,336 in fraud damages sustained by the plaintiff, instead of against that defendant's share of the $71,336 damage. Since "Diversified would not be able to collect four times the actual damages for those actual damages ... the amount of punitive damages awarded should not be justified by the whole amount of lass [sic] attributed to each defendant." Appellants misunderstand the purpose of punitive damages. The level of compen-

satory damages is determined with reference to the plaintiff's loss; the amount of a punitive damage award is decided with regard to punishing and deterring the defendant. *See* 22 Am. Jur 2d. Damages § 733 (1988) (observing that punitive damages "are imposed in view of the enormity of the misconduct rather than as a measure of compensation to the plaintiff."). The ratio of punitive to actual damages is useful in determining the appropriateness of an award of punitive damages not because the adequacy of a plaintiff's compensation is at issue in assessing the appropriateness of an award of punitive damages, but because the amount of the loss suffered by a plaintiff is of some use in gauging the degree of reprehensibility associated with a defendant's conduct.

15. Defendants' model results in ratios exceeding appropriate measures by a substantial margin. (Turner 31.5:1; Knapp 23.8:1; University 13.6:1; Haws 1.7:1.) The remitted amounts remain high under this measure. (Turner 2.9:1; Knapp 7:1; University 3.1:1; Haws 1.8:1.)

16. Jury's award: Turner 14.5:1; Knapp 12.1:1; University 14:1; Haws 1.1:1. Remitted award: Turner 2.1:1; Knapp 5.3:1; University 3.1:1; Haws 1.5:1.

nent of actual damages is also problematic on these facts. The legislature has placed limits on the type of misconduct that will support an award of punitive damages:

> [p]unitive damages may be awarded only if compensatory or general damages are awarded *and* it is established by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

Utah Code Ann. § 78–18–1(1)(a) (Supp.2001) (emphasis added). While simple negligence will not support punitive damages, negligence manifesting a knowing and reckless indifference toward the rights of others will. A determination must be made on the facts of each case whether the negligence complained of is of the sort that will support punitive damages.

 ¶ 30 Even if defendants' liability had been found to be of that variety which makes punitive damages appropriate, our precedent does not allow duplicative punitive damage awards for the same acts. We have to date disallowed as duplicative the assessment of a statutory penalty of double damages and of general punitive damages when "both punitive damage awards [were] based on the same set of facts." *Alta Indus. Ltd. v. Hurst*, 846 P.2d 1282, 1292 (Utah 1993). In *Steenblik v. Lichfield*, 906 P.2d 872, 881 (Utah 1995), we again held that a statutory penalty of treble damages coupled with an award of punitive damages was duplicative: "[h]owever wrongful his actions, [defendant] followed only one course of conduct. That this conduct persisted over time does not create two sets of facts for which he should be punished twice."[17] Defendants' liability in this case is based entirely on a single transaction, and while that transaction as a whole merits punitive damages, under Utah law each legal category under which defendants' actions can be described does not generally form an independent basis for punitive damages.[18] The trial judge's model for calculating actual damages, while plausible, does not conform with our precedent.

 ¶ 31 The instruction submitted to the jury regarding punitive damages asked the

17. The trial judge in *Steenblik* "characterized the treble damages as a statutory penalty 'assessed as a result of the reckless and intentional violations of the Act,' and said that 'punitive damages are punishment for defendant's malicious actions.'" 906 P.2d at 881. It would have been possible to treat the two awards of damages as punishing separate wrongful intents, to violate the act and to act maliciously, but in assessing awards of punitive damages, we have chosen to characterize incidents giving rise to liability in terms of course of conduct rather than in terms of intention.

18. Four federal circuit courts have reached a different conclusion. When a wrongful discharge led to punitive damage awards under both wrongful discharge and section 1983 claims, the Tenth Circuit held that trial courts

> must exercise caution in determining whether two or more punitive damage awards are duplicative ... In some cases, multiple punitive damage awards on overlapping theories of recovery may not be duplicative at all, but may instead represent the jury's proper effort to punish and deter *all* the improper conduct underlying the verdict ... [I]t is clear the jury found the discharge was motivated by two distinct, illegal factors: (1) political discrimination; and (2) retaliation for [plaintiff's] refusal to violate state law. One motivation violated [plaintiff's] constitutional rights, while the oth-

er violated Oklahoma public policy. Society has an interest in punishing Scott for *both* illegitimate intents.

*Mason v. Oklahoma Turnpike Auth.*, 115 F.3d 1442, 1460 (10th Cir.1997). The Ninth Circuit has reached a similar result regarding separate awards of punitive damages for equal protection and intentional infliction of emotional distress claims arising out of the same episodes of sexual harassment:

> These awards were not duplicative because they may be interpreted to represent the jury's intent to punish [defendant] for his disregard of both federal law (prohibiting sexual harassment and retaliation) and state policy (against intentionally causing emotional distress) in his continued harassment of [plaintiff].

*Mockler v. Multnomah County*, 1998 Nos. 96–35895, 96–36122, 1998 WL 166529, at *5, U.S.App. LEXIS 6641, at * 15 (9th Cir. March 31, 1998). The Eighth Circuit has allowed awards based on overlapping claims of tortious interference and fraud where the effects of the wrong and the defendant's intentions differed under the two claims. *Robertson Oil Co. v. Phillips Petroleum Co.*, 14 F.3d 373, 383 (8th Cir. 1993). The First Circuit has made the argument most forcefully, suggesting that "the considerations that operate to bar multiple recoveries are conceptually and legally inapplicable to punitive damages." *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 725 (1st Cir.1994).

jury to determine punitive damages globally, rather than in separate amounts for negligence and fraud.[19] In order to calculate the ratio under the seventh *Crookston* factor, however, it is necessary to determine what quantum of actual damages is to be compared with the punitive damage award. On a motion for new trial or remittitur it will be the task of trial courts to ensure that the measure of actual damages used as a basis for calculating the ratio does not result in a duplicative award. Here, plaintiff's description of defendants' negligence adds nothing to the description of their fraud. Exactly the same transaction and exactly the same behavior are urged as justification for punitive damages under theories of both fraud and negligence. On these facts, the behavior that punitive damages are intended to punish and deter is fully addressed by the award for fraud. Therefore, the appropriate measure of actual damages for the calculation of the punitive damages ratio is the $71,336 awarded for fraud.

■ ¶ 32 It is important to clarify one additional fact with regard to use of the *Crookston I* ratios. In *Crookston I*, we observed that if an award of punitive damages falls within accepted ratios "the trial court *may assume* that the award is not excessive." 817 P.2d at 811 (emphasis added). This use of "may" is permissive, rather than mandatory; a trial judge may allow an award within accepted ratios to stand without offering "any detailed explanation for its decision," *id.*, but a trial court is not obliged to allow an award that falls within accepted ratios to stand without further remittitur. The *Crookston I* ratios offer trial courts a presumptive ceiling, not a presumptive floor; a jury's finding that conduct will support an award of punitive damages does not entitle

plaintiffs to an award of three times their actual damages.[20]

¶ 33 Based on the foregoing analysis, we hold that a punitive damage award of $143,000, or approximately two times the amount of fraud damages suffered by the plaintiff, will serve as an adequate punishment and deterrent.

### B. University Properties

■ ¶ 34 University Properties acted through its employee, Knapp, throughout the transaction of which appellees complain. The acts of its employee are the basis of the company's vicarious liability, and are subject to the same analysis. The chief factor aggravating the award against Knapp, a lack of remorse increasing the likelihood of recidivism, is not directly applicable to a separate corporate entity. A ratio of 1:1 recognizes that defendant's conduct was wrongful. Moreover, a 1:1 ratio based on the total amount of fraud damage for which defendant is jointly and severally liable, not merely on this defendant's portion of that damage, is a significant punishment. An award of punitive damages equal to the fraud damages, $71,336 is adequate to punish and deter University Properties.

### C. The Haws Companies

■ ¶ 35 Haws' connection to the fraud is more attenuated than that of the other three defendants, and the arguments for a further remittitur with regard to Haws apply with even greater force. The remitted award is, however, within the acceptable ratios we outlined in *Crookston I*. The fact that an award falls within appropriate ratios is not, by itself, dispositive of the appropriateness of the

---

**19.** Jury Instruction 57 directed the jury that "[p]unitive damages may be awarded only if compensatory or general damages are awarded and it is established by clear and convincing evidence that the acts or omissions of the defendant were a result of willful and malicious conduct, or conduct that manifested a knowing and reckless indifference toward, and a disregard of, the rights of others." Postverdict Instruction A gave the jury more precise instructions regarding determination of punitive damages, but did not require the assessment of separate awards for negligence and fraud: the jury was to "award

such sum as, in [its] judgment, would be reasonable and proper as a punishment to the defendants for such wrongs, and as a wholesome warning to others not to offend in like manner."

**20.** The trial court's remittitur implicitly recognizes this fact. In determining the amount of the remitted award against Turner, the trial court averaged the statutory penalty for Turner's conduct and the three to one ratio permitted by *Crookston I*, thus arriving at a number well below three times the actual damages.

award, however. While the trial court indicated its belief that an award equal to 25% of a company's net worth is unlikely to result in bankruptcy, this award represents a substantial percentage of Haws' value, and further reduction is required. A punitive damage award of $50,000, while slightly below a 1:1 ratio, will serve to punish and deter Haws while reflecting its lesser participation in the fraud and its lower degree of culpability.

## IV. DAMAGES AGAINST BOTH KNAPP AND UNIVERSITY PROPERTIES

¶ 36 Defendants contend that plaintiff may not recover punitive damages against both Knapp and University Properties, since University Properties was owned and controlled by Knapp and there is no evidence to suggest that University Properties' participation was more active than "mere ratification." This claim is without merit. Corporations ordinarily act only through their agents, and, when the agent acts within the scope of his employment, the agent's liability generally becomes the liability of the employer. The Restatement (2d) of the Law of Agency confirms that "[a] master is subject to liability for the torts of his servants committed while acting in the scope of their employment." Restatement (Second) of Agency § 219 (1958). That liability may extend to liability for punitive damages:

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if ... the principal or a managerial agent authorized the doing and the manner of the act....

Restatement (Second) of Torts § 909(a) (1979). "Mere ratification" by an employer is precisely what justifies an employer's liability for the agent's actions.

¶ 37 We have relied on these provisions in defining the circumstances under which an employer can be liable for the intentional torts of an employee, and have found that

> an employer is liable for the torts of its employees that are committed within the scope of employment, even if the tortious

acts were intentional and not done solely to further the interests of the employer.

*Hodges v. Gibson Prods. Co.*, 811 P.2d 151, 156 (Utah 1991). *See also Clark v. Pangan,* 2000 UT 37, ¶ 8, 998 P.2d 268 ("This court has long recognized that an employer can be vicariously liable for the intentional tortious acts of employees under the theory of respondeat superior if those acts are conducted within the scope of employment.") Defendants' protestations that University Properties was wholly controlled by Knapp serve to illustrate the extent to which Knapp's actions were authorized by his employer and to make plausible the inference that these acts were undertaken at least in part to further the interests of University Properties. These facts enhance rather than diminish the liability of University Properties.[21] It was well within the jury's province to make awards against both Knapp and his employer, University Properties.

## V. THE EXCLUSION OF RESCISSION AND RESALE EVIDENCE

¶ 38 Defendants also maintain that the trial court erred in excluding evidence that defendants offered to repurchase the property after the fraud was discovered, and that, four years after the transaction in question, it sold the property at a substantial profit. A trial court's rulings with regard to the admissibility of evidence are generally accorded substantial deference: "[t]rial courts have wide latitude in making determinations of relevance, probativeness, and prejudice." *State v. 633 East 640 North*, 942 P.2d 925, 929 (Utah 1997). The rules of evidence explicitly allow trial courts to exclude evidence when its probative value is "substantially outweighed by the danger of ... confusion of the issues ... or misleading the jury." Utah R. Evid. 403. Had the evidence the defendants proposed been admitted, plaintiff would undoubtedly have wished to introduce its own evidence regarding the money it had already spent improving the property prior to its discovery of the fraud and the use to which it might have put its money had it not been fraudulently in-

---

21. The argument that a separate award of damages against Knapp and University Properties is improper because the corporation was not a separate legal entity but merely Knapp's alter ego was not made below and has been waived for the reasons set out in section I of this opinion.

duced to buy the property. Admitting the proposed evidence could very well have led to the confusion of the jury and to increasingly speculative evidence of what might have been had appellants not defrauded appellee. The trial court was well within its discretion to avoid this result by excluding the evidence.

## VI. THE USE OF A SUPERSEDEAS BOND TO TERMINATE A JUDGMENT LIEN

¶ 39 A supersedeas bond stays the execution of judgment pending appeal. Utah R. Civ. P. 62(d).[22] A supersedeas bond protects a judgment creditor's interest by providing a surety to whom the creditor may look should the appeal fail and the judgment debtor's financial position so deteriorate between judgment and disposition of the appeal that payment of the judgment by the debtor becomes impossible. *See generally* 5 Am. Jur.2d Appellate Review, § 441 (1995) ("[T]he purpose of a supersedeas bond is to protect nonappealing parties by maintaining the status quo during the appeal and insuring that those who have obtained the judgment under review will not be prejudiced by a stay of the judgment pending final determination of the appeal.")

¶ 40 A judgment lien provides a judgment creditor with a means of satisfying a judgment from a judgment debtor's real property. Proper recordation of a judgment creates a judgment lien on a judgment debtor's real property located in the county in which the judgment is recorded. Utah Code Ann. § 78–22–1(2) (Supp.2001). A judgment lien may be enforced by writ of execution, levy, and sale, and "has always been regarded as the highest form of security to a [creditor]."[23] *Belnap v. Blain*, 575 P.2d 696, 700 (Utah 1978) (citation omitted). Although the judgment lien statute creates a mechanism to assist in the enforcement of judgments, the

right it provides is not absolute. The right to enforce a judgment lien may be suspended by the filing of an appeal accompanied by a supersedeas bond, and recent statutory amendments allow a judgment lien to be terminated altogether if adequate security is posted pending appeal:

> 5(a) If any judgment is appealed, upon deposit with the court where the notice is filed, of cash or other security in a form and amount considered sufficient by the court that rendered the judgment to secure the full amount of the judgment, together with ongoing interest and any other anticipated damages or costs, including attorney's fees and costs on appeal, the lien created by [the judgment] shall be terminated as provided in subsection 5(b).
>
> (b) Upon the deposit of sufficient security as provided in Subsection (5)(a), the court shall enter an order terminating the lien created by the judgment ... and granting the judgment creditor a perfected lien in the deposited security as of the date of the original judgment.

§ 78–22–1(5). The legislature has thus made a policy decision that some means of releasing a judgment debtor's property from a judgment lien pending appeal is desirable; the legal question before us is whether a supersedeas bond satisfies the conditions of section 78–22–1(5).

¶ 41 The inclusion of "other security" in section 78–22–1(5)(a) clearly indicates that the legislature contemplated security other than cash as a substitute for the security provided by a judgment lien. The requirements of section 78–22–1(5)(a) are satisfied if the court rendering the verdict finds the "other security" to be sufficient in "form and amount." Section 78–22–1(5)(b) imposes an additional requirement, however. The order that releases the judgment lien must also

---

**22.** "When an appeal is taken the appellant by giving a supersedeas bond may obtain a stay, unless such a stay is otherwise prohibited by law or these rules.... The stay is effective when the supersedeas bond is approved by the court." Utah R. Civ. P. 62(d).

**23.** *Belnap* misquotes its source, *Kinney v. Vallentyne*, 15 Cal.3d 475, 124 Cal.Rptr. 897, 541 P.2d 537 (1975). In *Kinney* the court observed that

"a judgment lien has always been regarded as the highest form of security to a *creditor*." *Id.* 124 Cal.Rptr. 897, 541 P.2d at 539 (quoting *Morton v. Adams*, 124 Cal. 229, 56 P. 1038 (1899) (emphasis added)). In *Belnap* the court cited *Kinney*, but mistakenly stated that a judgment lien is security for a judgment debtor, rather than a judgment creditor.

grant the judgment creditor a "perfected lien in the deposited security." § 78–22–1(5)(b). The question of whether a supersedeas bond may serve as "other security" within the meaning of Section 78–22–1(5)(a) hinges on whether the court can grant a judgment creditor a "perfected lien" in a supersedeas bond within the meaning of section 78–22–1(5)(b).

¶ 42 The statute does not define perfection. " 'This silence compels us to "start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used." ' " *WWC Holding Co., Inc. v. Pub. Serv. Comm'n,* 2001 UT 23 ¶ 28, 44 P.3d 714 (quoting *Sec. Indus. Ass'n v. Bd. Of Governors of the Fed. Reserve Sys.,* 468 U.S. 137, 149, 104 S.Ct. 2979, 82 L.Ed.2d 107 (1984) (citations omitted)). A security interest is generally perfected by public notice; this notice gives the perfected interest priority over other security interests in the same collateral. *See, e.g., Black's Law Dictionary* 1157 (7th ed. 1999) ("Perfection: Validation of a security interest as against other creditors, usu[ually] by filing a statement with some public office or by taking possession of the collateral."). Utah's enactment of article 9 of the Uniform Commercial Code ("UCC") embodies this general concept of perfection through notice: subject to enumerated exceptions, "a financing statement must be filed to perfect all security interests." Utah Code Ann. § 70A–9a–310(1) (Supp.2001).[24] Through public notice, perfection both creates the priority of the perfecting creditor's claim and warns other creditors of that priority. "Perfection means that the secured party has taken all the steps required under article 9 to bring the interest to completion and establish a priority." *J.R. Simplot Co. v. Sales King Int'l, Inc.,* 2000 UT 92, ¶ 22, 17 P.3d 1100. The priority

created by perfection offers creditors considerable protection in the event of a competition for collateral: "a party who has secured its interest in accordance with article 9 has priority, upon a debtor's default, 'over "anyone, anywhere, anyhow" except as otherwise provided by the remaining Code priority rules.' " *Id.* at ¶ 14 (quoting *Insley Mfg. Corp. v. Draper Bank & Trust,* 717 P.2d 1341, 1346 (Utah 1986)) (quoting *Continental Am. Life Ins. Co. v. Griffin,* 251 Ga. 412, 306 S.E.2d 285, 287 (1983)).

¶ 43 In some circumstances recordation of a judgment provides a version of public notice that also serves to protect the interests of a creditor. If the function of perfection is the creation of priority through the provision of notice to third parties of a prior interest, it is possible to analogize between the public notice created by filing and that created by recordation of a judgment. In this loose sense of the term perfection, a court may be able to grant a "perfected" security interest if that interest is likely to have priority over competitors for the same collateral. Whether a court can give a "perfected" interest in a supersedeas bond in this sense becomes a question of whether a judgment creditor can enforce payment of a supersedeas bond against the surety who guaranteed that bond.

¶ 44 Plaintiff complains that a judgment creditor's security is diminished by the fact that "a bonding company could challenge its obligation under the bond." The "suretyship defenses" that are generally available to sureties are narrowly drawn, however, and relate primarily to actions of the obligee (the party to whom the surety owes the obligation) that may increase the extent or likelihood of the surety's liability. *See generally* Restatement (Third) of Suretyship and Guaranty §§ 37–44 (1996). The case law regarding the enforcement of supersedeas bonds is

---

24. Article 9 of the UCC elaborates a complex scheme for the creation and maintenance of perfection and for the determination of priorities to collateral when perfection is, and is not, properly created or maintained. The priority of judgment liens relative to other varieties of security interests is included in this scheme. The ability to terminate judgment liens and substitute other forms of security will likely create new complexities in determining priorities among secured creditors; courts will have to determine the pri-

ority of a surety who has paid the amount of a supersedeas bond relative to other creditors of the judgment debtor. The need for judicial resolution of varying priorities created by divergent legislative schemes has been noted by a number of commentators: "the rules governing priority among the various kinds of liens are contained in diverse bodies of law.... The courts are left to deal with the resulting inconsistencies." Lynn M. LoPucki et al., *Commercial Transactions: Revised Article 9 Supplement* 527 (2000).

not abundant; questions relating to supersedeas bonds often arise, not in the context of determining a surety's liability on a bond, but in determining a surety's priority among a judgment debtor's other creditors. These situations assume that the surety has been forced to honor its obligations under the bond; the near certainty of the surety's liability is underscored in early cases by reference to the "sacredness of contract obligations" embodied in a supersedeas bond. *Farmers' Loan & Trust Co. v. N. Pac. R. Co.*, 68 F. 36, 38 (E.D.Wis.1895).[25] Once a judgment from which an appeal is taken is affirmed, a surety on a supersedeas bond must pay the judgment creditor if the judgment debtor does not, whatever recourse the surety might subsequently have against the judgment debtor. "The liability of the principals and surety on the supersedeas bond became absolute when the judgment was affirmed and payment thereon was in default." *Bankers' Mortgage Co.v. Bramblett*, 128 Kan. 91, 93–4, 276 P. 67,68 (Kan.1929).

¶ 45 Consideration of a surety's priority relative to other creditors continues to drive judicial decisions regarding the use of supersedeas bonds; the Seventh Circuit has allowed the substitution of other security for a supersedeas bond pursuant to the federal rules of civil procedure because of its assumption that a supersedeas bond provides a judgment creditor with priority over other creditors. *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 786 F.2d 794, 797–98 (7th Cir.1986). Under the Seventh Circuit's reasoning, the difficulties associated with the bond are two-fold: a supersedeas bond for the entire amount of a judgment guarantees a judgment creditor full payment regardless of how that creditor would fare in competitions with other creditors without the security of the bond, and terms demanded by a bonding company may force a judgment debtor into bankruptcy, to the prejudice of other creditors. Consideration for the plight of other creditors compels the Seventh Circuit's reading of the federal rules as allowing other forms of security to substitute for a supersedeas bond under appropriate circumstances: "an inflexible requirement of a bond would be inappropriate ... in an age of titanic damage judgments ... where the requirement would put the defendant's other creditors in undue jeopardy." *Olympia Equip.*, 786 F.2d at 795. Underlying these concerns for other creditors is the assumption that the surety can be forced to pay the full amount of the bond, and that sureties, equally aware of their exposure to liability, will arrange terms to protect themselves at the expense of other creditors. *Olympia Equipment* raises significant concerns regarding the effect of a requirement of a supersedeas bond, concerns which confirm the fact that a supersedeas bond furnishes a judgment creditor with considerable security for payment.

¶ 46 If a solvent surety's obligation on its bond is clear, plaintiff still complains that the potential insolvency of a surety renders a supersedeas bond an inadequate form of security. While a competition for the assets of a bankrupt surety would raise complex questions, these questions are purely speculative with regard to this case. The insolvency of any party to litigation may affect the ability of other parties to enforce the rights conferred by a judgment; attempts to enforce judgments may cause judgment debtors to seek the protection of the automatic stay provided under bankruptcy law. Section 78–22–1(5)(a) gives the court discretion to approve any "other security" offered to terminate the judgment lien; a lien will be terminated only if the proffered security is "in a form and amount considered sufficient by the court that rendered the judgment to secure the full amount of the judgment." § 78–22–1(5)(a). If there is evidence of a surety's impending insolvency, the court need not approve the termination of a judgment lien. The mere suggestion that a company may

---

**25.** *Farmers'* exemplifies the tendency in this variety of case for the surety to fare poorly both in its efforts to avoid its obligations on the bond and in subsequent contests with the judgment debtor's mortgagers. Despite the fact that the surety in this case had agreed to post the bond only as an accommodation rather than for pecuniary gain, the court refused to allow the judgment debtor, who had gone into receivership, to pay the surety in preference to mortgagees. *Farmers'*, 68 F. 36 at 38, 39.

become insolvent at some point in the future is insufficient to defeat the proposition that a supersedeas bond may offer security for payment to the degree required by section 78–22–1(5).[26]

¶ 47 A judgment lien is a creature of statute, and it is for the legislature to alter the terms of its creation and termination. While the legislature has not defined perfection under section 78–22–1(5)(b) precisely, a supersedeas bond may provide a "perfected" security interest in the general sense of perfection as notice creating priority that creates in turn a high degree of security for payment. We conclude that a supersedeas bond determined to be sufficient in form and amount by the trial judge may serve as "other security" sufficient to release a judgment lien under section 78–22–1(5).

### CONCLUSION

¶ 48 Our consideration of the *Crookston I* factors mandates a further remittitur for each of the appealing defendants, and we have indicated the appropriate amounts. We affirm the trial court's determination that the supersedeas bond was security sufficient to terminate the judgment lien.

¶ 49 Justice WILKINS, and Judge THORNE concur in Chief Justice DURHAM's opinion.

¶ 50 Justice RUSSON concurs in the result.

HOWE, Justice, concurring and concurring in the result:

¶ 51 I concur in parts I, II, IV, V, and VI of the majority opinion. I concur only in the result of part III. I expressly do not endorse any of this court's decision in *Campbell v. State Farm Mutual Automobile Insurance Co.*, a decision that I did not participate in, being disqualified to sit in that case.

---

26. Plaintiffs offer no specific support for their suggestion that this particular company, Travelers Casualty and Surety Company of America, is likely to become insolvent. We note that Travel-

¶ 52 Having disqualified himself, Associate Chief Justice DURRANT does not participate herein; Court of Appeals Judge WILLIAM A. THORNE sat.

---

ers is included on the Department of the Treasury's Listing of Approved Sureties. Department of the Treasury Circular 570, effective July 1, 2002.